OPINION OF THE COURT
Anthony J. Cerrato, J.
"Vex not his ghost, O, let his pass! He hates him That would upon the rack of this tough world
*207 Stretch him out longer.”[1]
The issue before this court is literally one involving life and death. Whether characterized as "a right to die with dignity” or "euthanasia” or "mercy killing”, more and more courts are being called upon to render decisions made necessary because of modern medicine’s ability to postpone the dying process. (Matter of Quinlan, 70 NJ 10, 355 A2d 647; Matter of Storar, 52 NY2d 363; Matter of Conroy, 98 NJ 321, 486 A2d 1209; Matter of Jobes, 210 NJ Super 543, 510 A2d 133; Brophy v New England Sinai Hosp., 398 Mass 417, 497 NE2d 626.)
The Medical Society of the State of New York stated, in a brief to the Court of Appeals in the Storar case (supra), that "the law must take cognizance of the present ability to prolong biological existence in cases of terminal illness, as well as in cases of persons who are comatose or even in a vegetative state, and of the traditional inhibitions against releasing and relieving those whose further survival promises only a 'life’ of unending torment, incapacity and, in effect, dehumanization.” However, as Judge Hugh Jones noted in his dissenting opinion in Storar, the withdrawal of extraordinary life support medical procedures is irreversible and "may be thought by some to trespass on, the domain of Providence. Few areas of judicial activity” he went on to say "present such awesome questions or demand greater judicial wisdom and restraint.” (See, Matter of Storar, supra, pp 384-385.)
BACKGROUND
Daniel Delio, age 33, once a fine specimen of a man, is now, according to Dr. Robert Strobos, Director of the Department of Neurosurgery at the Medical Center, in a state of chronic vegetation with neocortical death — and no hope for improvement.[2] This vegetative condition followed cardiac arrest which *208 occurred during a surgical procedure for the repair of an anorectal fistula. A malpractice action has been commenced against St. Agnes Hospital and physicians concerned with that operation. Following the ill-fated operation, Mr. Delio was transferred to the Westchester County Medical Center and has been there since. While there is no respirator attached to Mr. Delio, he does receive nutrition and hydration through a tube connected directly to his stomach. He could live indefinitely in such state as long as nutrition and hydration via the feeding tube were maintained. This opinion by Dr. Strobos was corroborated by Dr. Sidney Carter and Dr. Paul Rosch, who were retained by the court-appointed guardian ad litem, James D. Hopkins, esteemed lawyer and former Judge. Julianne Delio, the wife of Daniel Delio, supported by Mr. Delio’s mother, seeks an order authorizing her to direct Westchester Medical Center, or some institution willing to comply-with her instructions, to remove the feeding tube, stop all feeding and nutrition, and stop treatment of all type for Daniel Delio. The Office of the District Attorney of Westchester County was served with the application but interposed no opposition to the relief sought.
At a hearing, Julianne Delio, as well as other relatives and friends, all testified that Daniel Delio was a person, who, occasionally in conversation, remarked that he never would want his life prolonged by artificial means if he were in a chronic vegetative state with no hope of recovery. Many of these conversations occurred when the Karen Ann Quinlan case was in the news. Again he made these remarks when his father had a stroke. This testimony was most compelling and satisfies in the mind of this court "the clear and convincing standard” established by the Court of Appeals in cases such as this. The types and number of these conversations, the occasions when they were said, and to whom, all point to a very physical man who, on some occasions, contemplated death, and in particular, dying with dignity.
The question before this court now is whether the law in New York will permit the termination of care, and eventual death, for Daniel Delio in accordance with his previously announced wishes.
*209 THE LANDMARK CASE OF STORAR
The Court of Appeals in Storar (supra) considered two separate applications brought on behalf of two terminally ill patients. Matter of Eichner (Fox) (on appeal from 73 AD2d 431) involved Brother Fox, an 83-year-old member of a Roman Catholic religious order, who was being maintained by a respirator after he suffered cardiac arrest while undergoing an operation to repair a hernia. Brother Fox sustained substantial brain damage and was characterized as being in a vegetative state. Father Eichner, with the support of the relatives of Brother Fox, sought under Mental Hygiene Law article 78 to be appointed committee of the person and property of Brother Fox with authority to direct the termination of what that court later described as "extraordinary medical care” (i.e., the respirator). The trial court upheld Father Eichner’s request for an order to terminate, noting that there existed (1) at common law a right of self-determination with respect to treatment to be applied to one’s body and (2) clear and convincing evidence that Brother Fox, prior to the operation, had expressed his wishes not to have extraordinary means, such as respirator, ever used to prolong his life.
In the other case (Matter of Storar, 52 NY2d 363, supra, on appeal from 78 AD2d 1013), the Court of Appeals reversed the lower court’s denial of an application for permission to administer medically necessary blood transfusions that would have prolonged the patient’s life. That application was brought by the director of a hospital on behalf of John Storar, a severely retarded inmate, afflicted with terminal cancer of the bladder. Storar’s mother refused to consent to the transfusions because they would only prolong his discomfort, and would not have been desired by him if he were competent to speak. The Court of Appeals noted (p 380) that since Storar "was always totally incapable of understanding or making a reasoned decision about medical treatment * * * it is unrealistic to attempt to determine whether he would want to continue potentially life prolonging treatment if he were competent.” The court went on to say that mentally John Storar was an infant and, accordingly, his rights are those of an infant. The court then noted that while "[a] parent or guardian has a right to consent to medical treatment on behalf of an infant (Public Health Law § 2504, subd 2) * * * [such] parent * * * may not deprive a child of lifesaving treatment, however well intentioned” (p 380).
Clearly, what can be gleaned from the Eichner portion of *210 the Storar decision is that there is authority in New York for permitting, on proper application, the withdrawal of a respirator, but only where there is clear and convincing (1) medical proof of irreversible brain damage without hope of restoration or improvement, and (2) evidence of the patient’s wishes, together with agreement of the family. It should be noted, however, that even the Court of Appeals emphasized (supra, p 370) "that any guidance we may provide for future cases is necessarily limited.” It was noted that "[u]nlike the Legislature, the courts are neither equipped nor empowered to prescribe substantive or procedural rules for all, most, or even the most common contingencies” (p 370).
STORAR’S APPLICABILITY TO INSTANT APPLICATION
A. SHOULD THERE BE A DIFFERENT RESULT BECAUSE BROTHER FOX WAS ON A RESPIRATOR AND THE INSTANT CASE INVOLVES A FEEDING TUBE?
To be sure there is a factual difference between the use of a respirator and the surgical attachment to Daniel Delio’s abdomen of a tube for feeding purposes. The furnishing of food and drink to the ill is traditional and symbolical of the duty commonly conceived to be due to a patient, whether or not terminally ill. It is more like the blood transfusions in the Storar case which the Court of Appeals required be given to John Storar over his mother’s objection. A respirator, on the other hand, is a far more complex mechanism than a feeding tube and requires constant monitoring. Of further note is the fact that the discontinuance of a respirator generally results in death in a short time, whereas removal of nourishment may well take several days or perhaps more than a week. The guardian ad litem points out, however, that "[b]oth * * * are intervening devices administered to a patient, affording life support which the natural processes of the patient cannot furnish and without which the patient would die within a fairly defined time.” (See also, Matter of Conroy, 98 NJ 321, 486 A2d 1209, supra, for discussion on this distinction.) Medical testimony at the Delio and Fox hearings clearly indicated that in neither case would removal of the life support device result in pain or discomfort to the patient.
A recent case in Massachusetts (Brophy v New England Sinai Hosp., 398 Mass 417, 497 NE2d 626, supra) involved a 48-year-old patient in a vegetative state who was being sup *211 plied nourishment through a gastrostomy tube. The Supreme Judicial Court held that the Commonwealth of Massachusetts’ interest in protecting life must yield to the patient’s substituted judgment, where the procedure of maintaining life was intrusive, and the patient, though not terminally ill, would never recover consciousness, having suffered irreversible damage to the upper brain.
More recently, in New York, however, Justice Alfred Robbins of the Supreme Court of New York (Nassau County) denied a request by Catherine Vogel to have the feeding tube removed from her husband. Mr. Vogel, although not terminally ill, or brain dead, was in a vegetative state following a stroke. Justice Robbins noted that it was "inconceivable that the concept of death by starvation should be embraced and established as a policy of this state.” (Matter of Vogel, 134 Misc 2d 395,399.) He went on to state that "Our humane society has not yet embraced a concept of sympathetic euthanasia.”
B. SHOULD AGE BE A DECISIVE FACTOR?
As noted, Brother Fox, in the Storar case was 83 years old, considerably older than Daniel Delio, who is 33. In Matter of Conroy (98 NJ 321, 486 A2d 1209, supra), the court there indicated that age was important and emphasized that its holding was restricted to elderly persons in nursing homes. Indeed, most of the applications which have been brought in recent years, have been on behalf of older, terminally ill patients. Perhaps, this is because modern medicine with its continued advancements may, as Dr. Rosch in this case intimated, provide a medical solution to the dilemma presently faced by Daniel Delio and his loved ones. Daniel Delio can exist indefinitely in the vegetative state awaiting, perhaps, some future medical breakthrough, where an aged and terminally ill patient cannot. It should be reiterated, however, that at present there is no form of medical treatment that can either cure or improve Mr. Delio’s condition.
C. IS TERMINAL ILLNESS A DECISIVE FACTOR?
Not one of the three medical doctors in this case described Daniel Delio as terminally ill. All three indicated that though he lies in an irreversible chronic vegetative state, with no cortical functions, he is otherwise in good health and could live, as just noted, indefinitely if fed through a tube. Both of the patients in the Storar case were described as "terminally ill”. In the recent Vogel case (supra), the court, in denying the application to remove an artificial feeding tube, specifically *212 noted that Vogel was not terminally ill. Terminal illness of patients appears to be a less decisive factor in the New Jersey cases. (See, Matter of Quinlan, 70 NJ 10, 355 A2d 647, supra; Matter of Conroy, 98 NJ 321, 486 A2d 1209, supra.)
OTHER VIEWPOINTS ON THIS SUBJECT
This court was indeed fortunate to have appointed someone of the caliber of former Justice of the Appellate Division James D. Hopkins as guardian ad litem. In his report, Mr. Hopkins summarized briefly the views of many groups and legal commentators on the issue raised by the present tragic condition of Daniel Delio. The court does hereby include much of this synopsis.
The President’s Commission, Deciding to Forego Life Sustaining Treatment, 121, 136, 190, concluded that a person’s own choices regarding health care ought to override the opinion of others about what best serves his interests, that the test of substituted judgment should govern the case of an incapacitated patient, and that where a permanently unconscious patient is not aware of nutrition, the members of the family and doctors should decide whether it should be continued. The AMA Council on Ethical and Judicial Affairs makes a similar judgment (245 JAMA 819), as does the resolution of the Massachusetts Medical Society adopted in July 1985.
Articles in medical journals echo this sentiment (Wanzer, The Physician’s Responsibility Toward Hopelessly III Patients, 310 New Eng J of Med 955, 958; Curran, Defining Appropriate Medical Care: Providing Nutriments and Hydration for the Dying, 313 New Eng J of Med 940, 942; Meyers, Legal Aspects of Withdrawing Nourishment from an Incurably III Patient, 145 Arch Int Med 125). There are, however, voices urging caution (Siegle and Weisbard, Against the Emerging Stream: Should Fluids and Nutritional Support be Discontinued, 145 Arch Int Med 129, 130; Dresser and Boisanbin, Ethics, Law and Nutritional Support, 145 Arch Int Med 122, 123, 124).
There are also a number of law review articles which have considered the general subject raised by this case. Some authors are of the view that when a patient is no longer able to decide for himself, his prior wishes to terminate treatment should be respected (Buchanan, Limits of Proxy Decisionmaking for Incompetents, 29 UCLA L Rev 386, 391; Richards, Constitutional Privacy, the Right to Die and the Meaning of Life: a Moral Analysis, 22 Wm & Mary L Rev 327, 407, 414). *213 Two eminent scholars argued some 25 years ago over the issue of involuntary termination of the incurably ill (anti: Kamisar, Some Non-Religious Views against Proposed "Mercy-Killing” Legislation, 42 Minn L Rev 969; pro: Williams, "Mercy-Killing” Legislation — a Rejoinder, 43 Minn L Rev 1; for an intriguing discussion of balancing one life against another, see, Fuller, The Case of the Speluncean Explorers, 62 Harv L Rev 616).
At least one legal commentator pointed out that if the Supreme Court of the United States, in Roe v Wade (410 US 113), defined as fundamental a right of a competent woman to control her own body, should not a person in a permanent vegetative state also have such a right — provided "only if that person’s prior expression of a desire to terminate care be proved.” (Note, The Tragic Choice: Termination of Care for Patients in Permanent Vegetative State, 51 NYU L Rev 285, 294.)
Moreover, the commentator goes on to say (p 292): "[I]n one sense, a person in a lingering vegetative state may have less claim to personhood than [even] the fetus [which is terminated during an abortion]. If nature runs its normal course, the fetus will develop the capability to survive outside the womb as a full person. The patient in a lingering vegetative state, on the other hand, can no longer survive independently, and merely waits, trapped by technology, for death’s release.”
A LEGISLATIVE SOLUTION NEEDED
In this most difficult area there seems to be but one unanimous conclusion — Legislatures are better suited than courts to balance the various interests involved in determining whether to permit termination of care. The Legislature, possessing as it does, the broad plenary power to make laws and regulations for the public health, safety and welfare, are the elected representatives of the people and as such reflect the collective will of the people. The Legislature is empowered to define "death” and "homicide” and can prescribe substantive rules and the procedural framework within which courts can decide the merits of each particular case. In that area, the Legislature in New York is found wanting.
Mental Hygiene Law article 80 was enacted by the Legislature (L 1985, ch 354, eff Apr. 1, 1986) to provide for surrogate decision-making for persons of impaired capacity in need of major medical treatment, and stipulates procedures to be *214 followed in defined geographic areas for a limited period on a demonstration basis. However, its terms clearly would not apply to Daniel Delio in any event (see, Mental Hygiene Law § 80.03 [b]). It is of interest in that it refers to the best interests of the patient as the test for the de cision, and declares that the decision should "reflect, to the extent possible, the patient’s own personal beliefs and values.” (Mental Hygiene Law § 80.01; cf. § 80.07 [d], [f].) Governor Cuomo’s Task Force on Life and the Law is currently considering the issues of the discontinuance of nutrition and hydration to a comatose patient in a persistent vegetative state but no report on this issue has yet come down.
CONCLUSION
However favorably disposed this court may be to granting the request to terminate the feeding tube, the authority to do so in the case at bar is unclear. Without question, Daniel Delio expressed his wishes prior to the tragedy which befell him, and by the clear and convincing proof those wishes were never to permit him to exist in a chronic vegetative state with no hope of recovery. However, in certain key aspects, the Storar case (52 NY2d 363, supra) can be distinguished from the case at bar. Brother Fox was considerably older than Daniel Delio. Brother Fox was terminally ill, while Daniel Delio is not. Brother Fox was on a respirator and Daniel Delio has a feeding tube attached to him. While these distinguishing features may or may not be decisive to the Court of Appeals should such court eventually hear this case (and I urge an appeal), they are enough in view of the "limited guidance” provided by that court to cause this Trial Justice to deny the relief sought.
My personal sympathies in this human tragedy are with the anguished wife, mother and relatives of Daniel Delio. Moreover, the prevailing view in our society, as recently reported in the New York Times, appears to support the withdrawal of artificial means of prolonging the life of a person in a chronic vegetative state with no hope of recovery. I do not doubt, as Judge Jones opined in his Storar dissent (supra, p 385), that "for many years physicians and members of patients’ families, often in consultation with religious counselors, have in actuality been making decisions to withhold or to withdraw life support procedures from incurably ill patients incapable of making the critical decisions for themselves.” However, plac *215 ing a judicial imprimatur on a decision to terminate the care in this case, in the absence of clear legislative or judicial guidance, is fraught with danger. In his majority opinion in Storar, Chief Judge Wachtler (then an Associate Judge) spoke of the need for judicial restraint in this area. The undersigned is of the view that judicial activism in cases such as this, can only involve the courts in a yet unsanctioned broad scale policy of euthanasia.
Accordingly, I am constrained to deny the petition to terminate.

. Shakespeare, King Lear, act V, scene iii (1963); Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYU L Rev 285.

. Daniel Delio is not dead according to New York law. While there is no statutory definition of "death”, a determination of death no longer focuses solely upon the common-law’s traditional criteria of cessation of heartbeat and respiration. In recent years, with the advent of machines that artificially maintain cardiorespiratory functions, a trend has established of also recognizing the cessation of brain functions as a criteria for death. Indeed, the Court of Appeals in People v Eulo (63 NY2d 341, 355) stated: "Considering death to have occurred when there is an irreversible and complete cessation of the functioning of the entire brain, including the brain stem, is *208 consistent with the common-law conception of death.” In this case, however, Daniel Delio was found to have some brain stem function. While he has sustained permanent and severe brain damage to the extent that he cannot respond appropriately to his environment, his brain is able to maintain internal homeostasis (that is, respiration, circulation and heartbeat).