In the Matter of JULIANNE DELIO, as Conservator of DANIEL DELIO, Appellant, v WESTCHESTER COUNTY MEDICAL CENTER et al., Respondents.

Second Department, June 1, 1987

1

---

### APPEARANCES OF COUNSEL

*Kramer, Dillof, Tessel, Duffy & Moore (Judith A. Livingston* of counsel), for appellant.

*Henry J. Logan, County Attorney (Terry Jane Ruderman* of counsel), for Westchester County Medical Center, respondent.

*James D. Hopkins,* guardian ad litem on behalf of Daniel Delio, conservatee.

*Fenella Rouse* and *Elena N. Cohen (Zavin, Sinnreich & Wasserman [Richard Wasserman]* of counsel), for Society For The Right To Die, Inc., *amicus curiae.*

### OPINION OF THE COURT

THOMPSON, J.

We address on this appeal the controversial and profoundly difficult question of whether the common-law right to decline medical treatment recognized by the courts of this State encompasses a right to remove or withhold artificial means of nourishment and hydration to an individual in a persistent vegetative state with no hope of recovery. Our analysis requires a careful balancing of the patient's firmly expressed desire to avoid efforts to sustain his life under circumstances which he would have considered degrading, demeaning and totally nonpurposeful, and the countervailing societal interest in the preservation of life. The individual's right to decline life-sustaining medical treatment must under certain circum-

stances yield to the limitations imposed by the State upon the exercise of a person's right to refuse treatment. While we are painfully aware of the responsibility which we undertake in reaching a determination in this matter, we are aided in our determination by the clear and convincing evidence presented at the hearing before the trial court that the patient for whom the application to withdraw medical treatment is made would, if competent, have rejected nutrition and hydration by artificial means and, in effect, would have chosen to allow the processes of nature to take their course. We conclude that, upon the facts of this case, the clearly expressed desires of the individual to die with dignity should be honored. Therefore, we reverse the judgment of the trial court and authorize the petitioner conservator to direct the discontinuance of life-sustaining medical treatment, including the provision of nutrition and hydration by artificial means.

I

At the time this proceeding was commenced, Daniel Delio, a married 33-year-old exercise physiologist, existed in a chronic vegetative state with no cognitive awareness and no hope for improvement as a result of complications from a routine surgical procedure undertaken to repair an anorectal fistula. The surgery was performed on May 19, 1986, at St. Agnes Hospital.[1] During the course of the operation, Daniel suffered cardiac arrest with resulting severe and irreversible brain damage. The extent of his injury is, indeed, so substantial that Daniel has been diagnosed as being neocortically dead, that is to say that while he retains a portion of his brainstem functions which regulate certain reflex activity such as breathing, he no longer possesses any higher brain activity and, thus, has no awareness, thoughts or feelings.

The day following his surgery Daniel was transferred to the Westchester County Medical Center (hereinafter the Medical Center) where he remains. Daniel breathes spontaneously and does not require the assistance of a respirator. However, he cannot chew food or voluntarily swallow. Therefore, nutrition and hydration have been provided to Daniel by means of two artificial devices which were surgically inserted on June 13, 1986. One known as a gastrostomy tube was inserted into his stomach and the other known as a jejunostomy tube was

---

1. A malpractice action has been commenced against St. Agnes Hospital and the attending physicians with respect to the events of May 19, 1986.

inserted directly into his small intestines. These artificial devices permit Daniel to receive nutrition and hydration directly and bypass his mouth and esophagus.

In August of 1986, Daniel's wife of six years, Julianne Delio, who herself is an exercise physiologist, applied for an order appointing her as conservator of Daniel's personal and financial affairs and authorizing her as conservator to direct the discontinuance of all medical treatment provided him including the removal of the surgically implanted feeding tubes and thereby the termination of the hydration and nutrition by artificial means. In this proceeding, Julianne named the Medical Center as well as the District Attorney of Westchester County as respondents. The District Attorney has declined active participation in this proceeding and has adopted the position that the application concerns a family matter under the supervision of the court. The Medical Center opposed Julianne's application on the ground that withdrawal of the feeding tubes would constitute a deliberate act which would cause Daniel's death contrary to its mission as a hospital to preserve life. The Medical Center was not opposed to aiding in Daniel's transfer to his home or to another facility but vigorously resisted any direction to compel it to act contrary to its ethical and moral standards.

Justice Anthony J. Cerrato of the Supreme Court, Westchester County, first heard the application for the appointment of a conservator. In October 1986, Julianne was appointed conservator of her husband without opposition by any party. That appointment is not at issue on this appeal. On the issue of the termination of the nutrition and hydration through artificial means, the court appointed former Appellate Division Justice James D. Hopkins as guardian ad litem to protect the rights and interests of Daniel. After extensive hearings were held on three separate dates, Justice Cerrato found the evidence clear and convincing that Daniel, while competent, had expressed his desire not to have his life sustained by artificial means if he were in a chronic vegetative state with no hope of recovery. Nevertheless, Justice Cerrato denied Julianne's application to withdraw the surgically inserted feeding tubes, finding that *Matter of Storar* (52 NY2d 363, *cert denied* 454 US 858), and its companion case *Matter of Eichner v Dillon* (52 NY2d 363), the leading New York authorities on "right to die" issues, were distinguishable in certain key features from the instant matter. Justice Cerrato concluded that while his "personal sympathies in this human tragedy [were] with the anguished

wife, mother and relatives of Daniel Delio", he believed that "placing a judicial imprimatur on a decision to terminate the care in this case, in the absence of clear legislative or judicial guidance, is fraught with danger" *(Matter of Delio v Westchester County Med. Center,* 134 Misc 2d 206, 214-215).

In the absence of specific legislation for resolving requests to terminate life-sustaining treatment for incompetent patients or any decision from this State's highest court resolving the precise problem with which we are presented, we must confront on this appeal the moral, ethical, philosophical, social and legal questions raised by this proceeding. We hold that Julianne, as conservator of Daniel, is entitled to act in accordance with the clearly expressed wishes of her now-incompetent husband and we, therefore, reverse the judgment entered upon Justice Cerrato's decision. In doing so, we provide that the Medical Center may either directly comply with the wishes of the conservator and conservatee by terminating all artificial life-sustaining treatment including withdrawal of the feeding tubes, or, if the Medical Center determines that it is unwilling to take the steps necessary to terminate the provision of nutrition and hydration to Daniel, it shall assist and facilitate Daniel's transfer to a facility willing to carry out his wishes or to his home, where his wishes may be effectuated.

## II

Prior to the onset of his comatose condition, Daniel was an energetic, active, healthy and fit young man in the prime of life. Indeed, Daniel was greatly concerned about his own physical health and fitness. He carefully monitored his diet, avoiding foods which might have a negative impact upon his health. Daniel was also a runner who had successfully completed three marathons.

Daniel was not only personally involved in the pursuit of fitness and health but his professional life was intimately connected with these values. He had earned a doctor of philosophy (hereafter PhD) degree in exercise physiology from Ohio State University. In the course of earning that degree, Daniel had received intensive scientific training including numerous courses in anatomy, physiology, biochemistry, nutrition, cardiovascular dynamics and the reading of electrocardiograms (hereinafter EKG). As a result of his scientific training, Daniel was very knowledgeable about the functioning of the human body. He understood the difference between the

brainstem and the cortical functions of the brain. Daniel was employed as an exercise physiologist at Kings County Hospital prescribing exercise programs for patients suffering from hypertension or diabetes.

Daniel's education and personal life-style led him to become a markedly opinionated individual with clearly expressed ideas and strong views on the subject of maintaining an incompetent neocortically dead person on life-sustaining mechanisms. While there does not appear to be any evidence that Daniel executed a "living will" to express his wishes concerning the artificial continuance of his life if he were rendered comatose, there was substantial testimony presented at the hearing conducted before Justice Cerrato that Daniel's views and wishes on this subject had been expressed repeatedly to his relatives and professional colleagues over the years. The inescapable conclusion to be drawn from the hearing testimony is that Daniel, under the present circumstances, would have refused nutrition and hydration by artificial means.

Julianne, the 32-year-old conservator, testified that she had known Daniel for over 13 years, the last six as his wife. She, too, had received a PhD in exercise physiology. Both she and her husband specialized within the field of exercise physiology in assisting individuals suffering from chronic and disabling diseases to exercise in a way that was safe and would achieve optimum physical and psychological results. In the course of their studies, both Julianne and Daniel had received intensive scientific training and were therefore able to discuss in scientific detail their views on "right to die" issues. Julianne and Daniel first had occasion to engage in a discussion on preserving the life of a comatose patient when, in the mid-1970's, the highly publicized case of Karen Ann Quinlan began to receive attention (see, *Matter of Quinlan*, 137 NJ Super 227, 348 A2d 801, *mod* 70 NJ 10, 355 A2d 647, *cert denied sub nom. Garger v New Jersey*, 429 US 922). The parents in the *Quinlan* case petitioned the court to remove the respirator from their then 21-year-old daughter Karen Ann, who, like Daniel, was in a chronic vegetative state but who, in addition, was, it was thought, unable to breathe spontaneously. Daniel expressed his total support for the Quinlans' application to disconnect the respirator, stating that no one who had suffered such severe brain damage as to be unable to survive without the aid of life-support systems should be compelled to continue to exist in such a state. Daniel extracted a promise from Ju-

lianne that should he ever be in a condition similar to Karen Ann Quinlan's she would take every possible step to prevent the preservation of his life by artificial means.

Following the discontinuance of the respirator in the *Quinlan* case, Daniel and Julianne again discussed their views on life-sustaining measures applied to comatose patients. Daniel felt it was "horrible" and "appalling" to keep a person alive in a vegetative state by artificial infusions of medication and nutrition. The discussion specifically touched upon the differences between the cortical and the brainstem functions and the various capabilities attached to each. Daniel believed that the destruction of the cortex was the equivalent of the cessation of life itself because the functions originating in the cortex provided the human qualities of an individual.

By the time Karen Ann Quinlan died many years after she had been removed from the respirator, Daniel's views that neither she nor any other person in her condition should be kept alive were even more firmly established. In the intervening years, he had received professional training and more fully understood the scope of the issue. At the time of Karen Ann Quinlan's death, Daniel repeated to Julianne his deeply held conviction that he would not want to be maintained artificially if he were to lapse into a chronic vegetative state.

Discussions of this nature entered the realm of Daniel's personal experience when in 1980 his father suffered a severe heart attack. Doctors were able to resuscitate Daniel's father but he lapsed into a coma and never regained consciousness before his death five days later. During those five days the doctors at the hospital where Daniel's father had been taken continued to resuscitate him when he experienced further incidents of cardiac arrest. When Daniel reviewed the EKG which had been performed and determined that his father had suffered extensive damage to his heart, he began insisting that the physicians in the hospital perform an electroencephalogram (hereinafter EEG) to determine the level of brain activity. Daniel became infuriated at their delay in performing the EEG and asked that no further efforts be made to resuscitate his father. Daniel was extremely distraught that heroic efforts were made to keep his father alive even though all indications were that he would never recover. In Daniel's mind, his father was already dead. In this emotionally charged situation, Daniel asked Julianne to renew her promise to him that she would not allow him to live for one day in a chronic vegetative state.

Margherita Delio, Daniel's mother, supported Julianne's application to discontinue providing her son with nutrition and hydration by artificial means. She testified that the circumstances surrounding her husband's death had affected Daniel very deeply. The fact that his father had been kept alive for five days in a comatose state made a deep impression upon Daniel. When Daniel was seeking to have an EEG performed on his father, he explained to his mother what an EEG was and told her that if the results showed that her husband would not recover he would take whatever measures necessary, including obtaining a court order, to prevent the hospital from preserving his life by artificial means. Prior to the EEG being performed, Daniel had spoken to a neurologist and cardiologist who told him that his father had little chance of recovery. That evening Daniel spoke with his mother and said that they had to accept the fact that her husband was dead. Before the EEG could be performed. Daniel's father died. Daniel expressed to his mother his feeling that the five days his father had been comatose in the hospital had been akin to his wake.

The strong impression his father's coma and death left with Daniel compelled him on repeated occasions thereafter to tell his mother that he would not want measures taken to keep him alive if he were comatose. Daniel expressed his views on the subject in unequivocal terms and told her of the agreement he had with his wife regarding his wishes if he were ever in a vegetative state. Daniel asked his mother to make a similar promise to him.

On the occasion of his mother's sixtieth birthday and just prior to his entering St. Agnes Hospital for surgery, Daniel explained to her the meaning of a living will and advised her that she should execute one even though he did not believe New York recognized living wills as valid. He further explained that in that way, she could prevent the same life-sustaining efforts from being taken to prolong her life as were taken to prolong the life of her husband. When she asked whether Daniel had prepared a living will, his response was that he was only 33 years old and had a little more time than she did. Margherita Delio also stated that although Daniel was raised a "Catholic" he did not follow any religious belief but considered himself an agnostic.

Dr. Benjamin Chu, the director of ambulatory care at Kings County Hospital, testified that he was Daniel's supervisor at

the hospital. Together they had developed an aerobic exercise program for patients with diabetes and hypertension. As part of this program, Daniel and Dr. Chu would regularly on Friday mornings conduct stress testing of potential candidates for the program. On the Friday prior to Daniel's scheduled surgery, as he and Dr. Chu conducted the stress testing, Daniel expressed his apprehension about the operation and his fear about being placed under general anesthesia. The two discussed the problems that could arise during surgical procedures and Dr. Chu attempted to allay Daniel's fears. In the course of their conversation, Daniel, who Dr. Chu described as being sophisticated in medical procedures, again expressed the view that he would never want to be maintained in a vegetative state.

The testimony of Daniel's sister-in-law Janet Bishop and his brother-in-law Robert Bishop, with whom Daniel had developed a very close relationship, contributed further evidence of Daniel's strongly held beliefs on the quality of life and his right to die. In July 1985, Janet Bishop, who at the time was pregnant, discussed with Daniel and Julianne the fact that her baby would have to be delivered by Caesarean section. They discussed the case of a pregnant Albany woman who had been given the wrong medication rendering her comatose. Daniel told Janet and Robert of his father's ordeal before his death and expressed again his conviction that he would not want to be maintained in a comatose state because being in a coma was not living.

Father Andrew Varga, a Jesuit priest and a professor of philosophy at Fordham University, testified as an expert on the ethical issues involved in the discontinuance of life-sustaining mechanisms in the event the patient lapsed into an irreversible vegetative condition. Father Varga testified that a Vatican document published in 1980 rejected the distinction between ordinary and extraordinary means of life support as a measure of when it would be ethical to discontinue those means of support; rather, the Vatican adopted a test of proportionality under which the measure of whether to discontinue life-sustaining mechanisms was whether those mechanisms would provide benefits to the patient greater than the burdens imposed on the patient, the family and others as a result. Father Varga testified that the discontinuance of nutrition and hydration presently furnished to Daniel by artificial means would be ethical and in accordance with Vatican doctrine since Daniel's condition is irreversible and maintain-

ing him in his present condition places an enormous burden upon his family both economically and emotionally.

## III

The consulting neurologist on Daniel's case, as well as a neurologist and an internist who examined Daniel at the behest of the guardian ad litem, also testified at the hearing before Justice Cerrato. The medical testimony was conclusive and consistent that Daniel had suffered severe damage to his brain from which there is no hope that he will ever recover or improve, but that, with the assistance of feeding tubes, he could live in this state indefinitely. Dr. Robert Strobos, the director of the Department of Neurosurgery and a professor of neurology at the Medical Center, testified that he had examined Daniel and been involved continuously in his case from the date following his surgery at St. Agnes Hospital until the date of the hearing. During that entire period Daniel had exhibited no indication of higher brain functioning and, indeed, further testing had indicated additional deterioration of the cells of the cortex of the brain. Dr. Strobos' diagnostic evaluation indicated that while Daniel was not technically "brain dead", he had suffered neocortical death.[2] Thus, Daniel has no ability to commit a voluntary act nor does he have any perceptual or sensatory awareness. He has a total lack of consciousness of his environment.

Dr. Strobos distinguished Daniel's chronic vegetative state from the condition commonly known as a comatose state, for in the latter situation the patient may still have some electrical (cortical) activity. While the cortical cells of a "comatose" patient would not be functioning normally, they may repair themselves. In Daniel's case, there has been a complete deteri-

---

2. A distinction is drawn between "whole brain death" meaning the irreversible cessation of all functions of the brain, including the brainstem, and "neocortical death" which occurs when a patient suffers an irreversible loss of cognition and consciousness, but retains brainstem functions (see, Smith, *Legal Recognition of Neocortical Death,* 71 Cornell L Rev 850, 856-857 [1986]). Although one commentator has advocated acceptance of a broad neocortical definition of death, New York has adopted the view that rejects the traditional cardiopulmonary definition of death requiring the irreversible cessation of heart and lung functions in favor of a brain death standard holding death to have occurred when the entire brain ceases functioning (see, People v Eulo, People v Bonilla, 63 NY2d 341; *see also,* Merritt, *Equality for the Elderly Incompetent: A Proposal for Dignified Death,* 39 Stan L Rev 689, 694-695 [1987]). Under the New York standard, Daniel is not dead.

oration of the cortical cells rendering any repair impossible. Dr. Strobos knew of no reported case of a person in Daniel's condition who had ever regained any awareness or conscious functioning.

Dr. Strobos further testified that a portion of Daniel's brainstem where most reflex activity originates was still functioning. The indicators of brainstem activity were that Daniel was able to breathe on his own,[3] had some reflexive blinking response and made spontaneous chewing and sucking motions. Daniel's digestive system is functioning, but he is unable to chew or swallow voluntarily. Although Daniel's body responds to deeply painful stimulation by an exaggeration of his decerebrate rigidity, that is, an increase in bodily rigidity and increased respiration, Dr. Strobos stated that Daniel's response was reflexive and in no way indicated that Daniel has a conscious awareness of pain. Dr. Strobos was reasonably certain that Daniel would not experience sensations of hunger or thirst, nor did he believe Daniel could experience pain from the discontinuance of nutrition and hydration by artificial means. Dr. Strobos concluded his testimony by stating that Daniel's death was not imminent because he was not terminally ill or suffering from any underlying disease or condition likely to cause his death. Because of his superb physical condition prior to this tragic incident, Daniel may ostensibly continue to live in his present persistent vegetative state for many years. However, Dr. Strobos considered it unlikely that Daniel would live longer than 10 years because of the elevated risk of infection and pneumonia in his present state. His life might also be shortened by the application of a nonaggressive medical treatment plan requiring that medical treatment be withheld should infection or another medical condition develop.

Dr. Sidney Carter, a neurologist, and Dr. Paul J. Rosch, an internist, examined Daniel as experts on behalf of the guardian ad litem, and testified at the hearing as to the results of their respective examinations. Their findings and medical opinion were consistent with those of Dr. Strobos. Specifically, Drs. Carter and Rosch both shared the opinion of Dr. Strobos, based upon their independent findings, that Daniel was in an

---

3. Daniel breathes on his own but he has a tracheostomy tube in his trachea which permits removal of excess secretions which could block his airways and might also cause pneumonia. A tracheostomy tube does not operate mechanically. Daniel also is attached to a catheter to permit the removal of urine.

irreversible persistent vegetative state from which there was no hope of recovery and in which he could remain alive indefinitely if the current level of medical care were maintained. Drs. Carter and Rosch also shared Dr. Strobos' view that because of the lack of cortical function, Daniel would not suffer any discomfort as a result of the withdrawal of nutrition and hydration by artificial means. Dr. Carter believed Daniel would resist any attempt to place food in his mouth, and in any event, he could not chew or swallow.

After the conclusion of the hearing, the guardian ad litem submitted a thoughtful and comprehensive report in which he concluded that the court had the power to grant the relief sought by Julianne, the conservator, and urging that, upon these facts, the court should exercise its power by authorizing the conservator to withdraw life-sustaining treatment including nutrition and hydration by artificial means.

### IV

In an extensive opinion dated December 5, 1986, Justice Cerrato refused to authorize the removal of the feeding tubes *(Matter of Delio v Westchester County Med. Center,* 134 Misc 2d 206, *supra).* Although Justice Cerrato found that Daniel's condition was permanent and that the conservator established by clear and convincing proof that Daniel, when competent, had clearly expressed his wishes that he not be artificially maintained in a chronic vegetative state with no hope of recovery *(Matter of Delio v Westchester County Med. Center, supra),* he concluded, in the exercise of judicial restraint, that he should not authorize the termination of this type of care without some sort of legislative or judicial guidance *(Matter of Delio v Westchester County Med. Center, supra).*

In reaching his determination, Justice Cerrato distinguished *Matter of Eichner v Dillon* (52 NY2d 363, *supra),* a leading New York case on this issue, from the matter before us. The key distinguishing features, in his opinion, were that Brother Fox, on whose behalf the petitioner Eichner brought the application (1) was elderly while Daniel was 33 years old when afflicted, (2) was terminally ill, while Daniel suffered from no terminal illness, and (3) was maintained on a respirator, while Daniel had a feeding tube attached to him *(Matter of Delio v Westchester County Med. Center, supra,* at 210-211). Justice Cerrato believed that "Legislatures are better suited than courts to balance the various interests involved in determin-

ing whether to permit termination of care" *(Matter of Delio v Westchester County Med. Center, supra,* at 213), and concluded that "judicial activism in cases such as this, can only involve the courts in a yet unsanctioned broad scale policy of euthanasia" *(Matter of Delio v Westchester County Med. Center, supra,* at 215).

In the judgment appealed from, dated January 28, 1987, the conservator's application to discontinue all medical treatment including nutrition and hydration by artificial means was denied.

The conservator has appealed from this order. The guardian ad litem submitted a brief in support of the conservator's appeal recommending the termination of life-sustaining care. The Medical Center's brief submitted in support of affirmance sets forth two arguments: (1) the Supreme Court lacked the authority to grant the relief sought, namely, the removal of feeding tubes and the termination of nutrition and hydration by artificial means, in the absence of clear legislative or judicial fiat creating such authority; and (2) even if this court determines that it possesses the authority to authorize termination of treatment, the Medical Center should not be compelled against its will to withdraw nourishment and hydration from a patient in a chronic vegetative state. We turn then to a consideration of the substantive issues of law.

## V

The determination of whether life-sustaining treatment may be withheld or withdrawn from an incompetent patient must derive in large measure from a consideration of the rights of a competent patient to refuse medical treatment. The right to self-determination with respect to one's body has a firmly established foundation in the common law. More than 70 years ago, Justice Benjamin Cardozo articulated this principle, stating that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body" *(Schloendorff v Society of N. Y. Hosp.* 211 NY 125, 129). The doctrine of informed consent developed out of the common-law principles and requires that, absent an emergency, before performing any medical procedure, a physician obtain the consent of a patient, after explaining the nature of the treatment, substantial risks and alternative therapies, or risk the imposition of civil liability upon his failure to obtain informed consent *(see, e.g., Matter of Storar,* 52 NY2d 363, 376-

377, *supra; Schloendorff v Society of N. Y. Hosp., supra,* at 129-130; *see also,* Cantor, *A Patient's Decision to Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life,* 26 Rutgers L Rev 228, 236-238 [1973]). This right to control the course of one's medical treatment also has a statutory basis in New York *(see,* Public Health Law §§ 2504, 2805-d; CPLR 4401-a; 10 NYCRR 405.25 [a] [7]; *see generally, Rivers v Katz,* 67 NY2d 485, 492-493). An obvious corollary to these principles is that the common-law right of self-determination with respect to one's body also forms the foundation for a competent adult patient's right to refuse life-sustaining treatment even if the effect is to hasten death *(see, Rivers v Katz, supra; see also, Matter of Conroy,* 98 NJ 321, 346-347, 486 A2d 1209, 1222).

Several courts in our sister States have found that the Federal constitutional right of privacy is broad enough to encompass decisions as to medical treatment and offers protection to a competent adult's right to make medical decisions *(see, e.g., Bartling v Superior Ct.,* 163 Cal App 3d 186, 209 Cal Rptr 220; *Matter of Quinlan, supra; Satz v Perlmutter,* 362 So 2d 160, 164, *approved* 379 So 2d 359 [Fla]; *Superintendent of Belchertown State School v Saikewicz,* 373 Mass 728, 739-740, 370 NE2d 417, 424). However, the New York Court of Appeals in *Matter of Storar* (52 NY2d 363, 376-377, *supra)* declined to reach the constitutional issue because it found the right to refuse medical treatment was fully embraced by the common-law right to self-determination *(accord, Matter of Conroy,* 98 NJ 321, 346, 486 A2d 1209, 1223, *supra).* Therefore, in the context of this decision we will direct our attention to common-law principles and leave the question of whether a constitutional right of privacy might apply to treatment issues of the type at bar until such time as the Court of Appeals has addressed the question.

While the right of a competent patient to refuse medical treatment cannot be gainsaid, the extension of this right to incompetent patients is a more complex issue. The New Jersey Supreme Court in the landmark *Quinlan* case (70 NJ 10, 41, 355 A2d 647, 663-664 *supra)* first extended the right to refuse medical treatment to incompetent patients, basing the extension on the constitutional right of privacy. Since the *Quinlan* decision, the right of incompetent patients to equal treatment with competent patients with regard to the right to terminate life-sustaining or life-prolonging medical treatment has been

widely recognized *(see, e.g., Matter of Storar, supra,* at 378-379; *Severns v Wilmington Med. Center,* 421 A2d 1334 [Del]; *Matter of Spring,* 380 Mass 629, 634, 405 NE2d 115, 119; *Superintendent of Belchertown State School v Saikewicz,* 373 Mass 728, 745, 370 NE2d 417, 427, *supra).* As noted by the Supreme Judicial Court of Massachusetts in *Saikewicz (supra,* at 745, at 427), the "value of human dignity" extends to both competent and incompetent patients and, consequently, compelling either to submit to life-sustaining treatment contrary to their wishes constitutes an impermissible invasion upon their bodily integrity and self-determination.

Against this background, the starting point of our analysis must be the seminal New York case in this area of *Matter of Storar* (52 NY2d 363, *supra),* and its companion case *Matter of Eichner v Dillon* (52 NY2d 363, *supra).* The latter case involved an application to disconnect a respirator from an 83-year-old man, Brother Fox, who had lapsed into a coma during a surgical procedure to correct a hernia. After suffering cardiac arrest which resulted in a loss of oxygen to his brain and substantial brain damage, Brother Fox was placed on a respirator because he had lost the ability to breathe spontaneously. The consensus of medical experts who examined Brother Fox was that he was in a chronic vegetative state from which he had no reasonable chance of recovery. Father Eichner, the director of the Catholic religious order of which Brother Fox had been a member for over 66 years, applied to be appointed as committee of Brother Fox with authority to direct the removal of the respirator. The uncontroverted testimony at the hearing on the application, which was opposed by the District Attorney of Nassau County, was that there was no reasonable likelihood that Brother Fox would ever emerge from the vegetative state and that prior to his comatose condition Brother Fox had expressed his desire not to have his life prolonged by life-sustaining procedures if his condition were hopeless. The Court of Appeals in reliance on the common-law right of every person of adult years and sound mind to determine what should be done to his body *(see, Schloendorff v Society of N. Y. Hosp.,* 211 NY 125, *supra),* held that an incompetent person has the common-law right to have life-sustaining medical treatment terminated where it is established by clear and convincing evidence that the person, when competent, expressed the desire to invoke that right, and where there are no countervailing compelling State interests

present. Accordingly, the court held that the treatment preference expressed by Brother Fox should be honored.[4]

The Medical Center argues that the case before us is distinguishable from the Brother Fox case because of the type of treatment involved in each. The Medical Center draws a distinction between a respirator, which it characterizes as "extraordinary medical care", and nutrition, arguing that the common-law right of bodily self-determination should be confined to the former. This distinction was apparently the primary source of Justice Cerrato's reluctance to honor Daniel's clearly expressed wish. While no New York appellate court has previously addressed the issue of the termination of the use of artificial feeding devices to sustain life or defer the moment of death,[5] we do not believe that the Court of Appeals limited its holding in the Brother Fox case on the basis of the type of treatment sought to be discontinued. Indeed, the court specifically left open the possibility that other forms of treatment might be refused. The court noted that there was no need to speculate as to whether Brother Fox would have refused the particular type of treatment that Father Eichner sought to have discontinued, since his case was identical to the *Quinlan* case (*Matter of Quinlan*, 70 NJ 10, 355 A2d 647, *supra*). Since the *Quinlan* case prompted Brother Fox to express his desire not to have his life prolonged if his condition were hopeless, implicit in his statement was that he would not want to be maintained on a respirator (*Matter of Eichner v Dillon, supra,* at 380). The primary focus evident in the Court of Appeals analysis is upon the patient's desires and his right to direct the course of his medical treatment rather than upon the specific treatment involved.

The courts of other States that have addressed the controversial issue of withholding artificial nutrition and hydration

4. Brother Fox died before the appeal was decided, but the court addressed the issues raised due to their public importance.

5. Two New York trial court decisions have addressed the precise issue concerned on this appeal, i.e., withdrawal of feeding tubes, and both reached a result similar to that reached by Justice Cerrato herein (*Matter of Vogel,* 134 Misc 2d 395; *Matter of Chetta,* Sup Ct, Nassau County, May 1, 1987, Becker, J.). The *Vogel* decision found that the type of treatment involved was determinative and, thus, found that since providing nutrition by artificial means was different from providing a respirator, it could not be discontinued. Justice Becker in *Matter of Chetta* makes the same distinction, albeit somewhat reluctantly, citing the Massachusetts case *Brophy v New England Sinai Hosp.* (398 Mass 417, 497 NE2d 626) as a comparison to his determination which denied the application to discontinue feeding.

devices have similarly refused to differentiate between the various artificial devices available to sustain the life of a patient in a persistent vegetative state. The leading New Jersey decision in *Matter of Conroy* (98 NJ 321, 486 A2d 1209, *supra)* is instructive. That case involved Claire Conroy, an 84-year-old nursing home patient who was severely senile and suffering from numerous physical ailments. The patient could not speak and her ability to swallow was very limited. She was not comatose or in a chronic vegetative state and was still marginally aware of her environment. The medical evidence was inconclusive as to whether or not Miss Conroy experienced pain. Miss Conroy's nephew and only living blood relative, who had been appointed her guardian, sought permission to remove a nasogastric feeding tube that supplied Miss Conroy with nourishment. The patient was expected to live less than a year if the nasogastric feeding were continued but without it death would likely occur within a week. In fact, Miss Conroy died while the appeal was pending but because of the public importance of the issues involved the appeal was considered. The New Jersey Supreme Court declared that life-sustaining treatment, including nourishment and hydration by artificial means, may be withheld from incompetent, institutionalized, elderly patients with severe and permanent mental and physical impairments and a limited life expectancy. Because the New Jersey court restricted its holding to nursing home residents its precedential value is, concededly, somewhat limited. Nevertheless, its value lies in the court's analysis of various issues with which we are confronted on this appeal. Primary is the court's emphasis upon the patient's desires and experience of pain and pleasure rather than on the type of treatment involved *(Matter of Conroy,* 98 NJ 321, 369, 486 A2d 1209, 1233, *supra)* and its rejection of any distinction between feeding by artificial means and other forms of medical treatment *(Matter of Conroy,* 98 NJ 321, 371, 486 A2d 1209, 1235, *supra).* Significantly, the intermediate New Jersey appellate court had held that because the nutrition and hydration provided through the nasogastric tube was "ordinary" care and was not an artificial life-sustaining device, it could not be removed *(Matter of Conroy,* 190 NJ Super 453, 473, 464 A2d 303, 314). The Supreme Court of New Jersey, in overturning the Superior Court, Appellate Division, found that the distinction between extraordinary and ordinary types of treatment was not meaningful because of the various conflicting meanings the terms had assumed. In finding that feeding by artifi-

cial means was equivalent to breathing by means of a respirator, the court opined that any distinction drawn was more psychologically compelling because of the emotional symbolism of food than it was logically sound. The court persuasively reasoned: "Certainly, feeding has an emotional significance. As infants we could breathe without assistance, but we were dependent on others for our lifeline of nourishment. Even more, feeding is an expression of nurturing and caring, certainly for infants and children, and in many cases for adults as well" *(Matter of Conroy* 98 NJ 321, 372, 486 A2d 1209, 1236, *supra).*

However, the court recognized that in "the realm of complex, high-technology medical care" *(supra,* at 372, at 1236) the emotional symbolism of food was without meaningful significance. Recognition of this fact prompted the court to reason that: "artificial feedings such as nasogastric tubes, gastrostomies, and intravenous infusions are significantly different from bottle-feeding or spoonfeeding—they are medical procedures with inherent risks and possible side effects, instituted by skilled health-care providers to compensate for impaired physical functioning. Analytically, artificial feeding by means of a nasogastric tube or intravenous infusion can be seen as equivalent to artificial breathing by means of a respirator. Both prolong life through mechanical means when the body is no longer able to perform a vital bodily function on its own" *(Matter of Conroy,* 98 NJ 321, 373, 486 A2d 1209, 1236, *supra).*

The recent decision of the Supreme Court of Massachusetts in *Brophy v New England Sinai Hosp.* (398 Mass 417, 497 NE2d 626) adopted the reasoning of the New Jersey court in *Conroy* and authorized the discontinuance of nutrition and hydration through a gastrostomy tube to a patient in a persistent vegetative state who had previously expressed a desire not to have his life prolonged by artificial means. The court particularly noted that it refused to distinguish between types of treatment in this context or to base its decision on a distinction between extraordinary or ordinary treatment or between withholding and withdrawing treatment *(Brophy v New England Sinai Hosp.,* 398 Mass 417, 437-438, 497 NE2d 626, 637-638, *supra).*[6]

---

6. In a recent decision of the Supreme Court, Bronx County, Justice Tompkins distinguished between passive medical treatment which he refused to permit to be discontinued and active medical treatment which, in

In our review of the decisions in other jurisdictions, we failed to uncover a single case in which a court confronted with an application to discontinue feeding by artificial means has evaluated medical procedures to provide nutrition and hydration differently from other types of life-sustaining procedures (see, Bouvia v Superior Ct., 179 Cal App 3d 1127, 225 Cal Rptr 297; Barber v Superior Ct., 147 Cal App 3d 1006, 195 Cal Rptr 484; Corbett v D'Alessandro, 487 So 2d 368 [Fla]; Matter of Hier, 18 Mass App 200, 464 NE2d 959, review denied 392 Mass 1101, 465 NE2d 261; see also, Note, In re Conroy: A Limited Right to Withhold or Withdraw Artificial Nourishment, 6 Pace L Rev 219, 260-261 [1986] [approving the Conroy court's refusal to distinguish between artificial feeding and other medical treatment]; Merritt, Equality for the Elderly Incompetent: A Proposal for a Dignified Death, 39 Stan L Rev 689, 716, n 180 [1987], quoting from President's Commn for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment, at 190; cf., Harber, Withholding Food and Water from a Patient—Should It Be Condoned in California?, 16 Pac LJ 877 [1985]).

The matter before us may be factually distinct from Conroy (supra) but it is very similar to the Brophy case (supra). We agree with those courts' decisions that the withdrawal or withholding of feeding by artificial means should be evaluated in the same manner as any other medical procedure. In this respect, we view nutrition and hydration by artificial means as being the same as the use of a respirator or other form of life support equipment (see, Barber v Superior Ct., 147 Cal App 3d 1006, 1017, 195 Cal Rptr 484, 490, supra; Matter of Conroy, 98 NJ 321, 373, 486 A2d 1209, 1236, supra). By parity of reasoning, the Storar decision is stare decisis for the proposition that the dispositive issue is whether the petitioner demonstrated by clear and convincing evidence that Daniel had expressed a desire to discontinue life-prolonging treatment in these circumstances.

The Medical Center urges in this respect that the instant case is more analogous to the Storar case than to its compan-

---

accordance with the clearly expressed wishes of the patient prior to the onset of the chronic vegetative state held could properly be refused (see, Workmen's Circle Home & Infirmary for Aged v Fink, 135 Misc 2d 270). We find that this distinction is of questionable value as it obscures the real issue of what are the patient's desires with respect to life-sustaining medical treatment.

ion, the *Eichner* case. The former case involved a profoundly retarded 52-year-old man with a mental age of 18 months who had terminal cancer of the bladder. He had been a resident of a State facility since the age of five and his only close relative was his 77-year-old mother who visited him almost daily. Although his mother had given her consent for radiation therapy, once the cancer was diagnosed as terminal and constant blood transfusions became necessary, she requested that the transfusions be discontinued because her son found them disagreeable. Regardless of treatment, the patient's life span was estimated at between 3 and 6 months, so that the transfusions served only to prolong the patient's suffering. Because the patient's mother refused to consent to the blood transfusions, an official at the State facility where the patient resided sought permission to continue to administer blood transfusions to the patient. The Court of Appeals expressly distinguished the *Storar* case from the facts in *Eichner* because the patient in *Storar* had never been competent to make a reasoned decision about his medical treatment; he was never competent to exercise or to decline to exercise his right to refuse medical treatment. The court found it "unrealistic to attempt to determine whether he would want to continue potentially life prolonging treatment if he were competent" *(Matter of Storar,* 52 NY2d 363, 380, *supra),* and concluded that the only realistic way to assess the patient's rights was to classify him as an infant. Proceeding from this basis, the court held that the State's interest as *parens patriae* in protecting the health and welfare of the child prohibited the courts from permitting a parent to deny a child all treatment for a condition which threatens his life. Since the transfusions apparently did not involve excessive pain and they maintained the patient's mental and physical activities at their usual level, the court required the administration of the blood transfusions over the objections of the patient's mother.[7] In the course of its discussion the court analogized the blood transfusions to food, noting that while they would not cure the cancer, they would eliminate the risk of death from another treatable cause *(Matter of Storar, supra,* at 381). In our opinion, the analogy drawn in *Storar,* as well as the end result, does not mandate that the relief requested herein be denied in contravention of Daniel's clearly expressed wishes.

---

7. As in the *Eichner* case, the patient in *Storar* died pending the determination of the appeal.

The *Storar* decision hinged on the absence of past expressions of intent concerning life-sustaining treatment and evidenced the court's unwillingness to judge the quality of the remainder of the patient's life.

Any doubt as to the appropriateness of substituting the wishes of the patient's guardian for that of the patient is dispelled by the Court of Appeals subsequent decision in *People v Eulo* (63 NY2d 341, 357, *supra)*, which held: "Under existing law, third parties are without authority to determine on behalf of the terminally ill that they should be permitted to die. This court will make *no* judgment as to what is for another an unacceptable quality of life". (Emphasis supplied.)

Viewed in this context, the court's equating of food and blood transfusions must be deemed limited to those situations involving a patient who had never had the capacity to express his desires on treatment issues. The statement must be read in the context of the court's conclusion that the State's interest in protecting the incompetent patient's health and welfare took precedence over his mother's desire to put an end to his suffering. That the patient in *Storar* could have refused blood transfusions had he been competent to determine the course of his treatment is not seriously subject to dispute. If such is the case, the State's interest as *parens patriae* is not implicated and the patient's right to refuse intrusive treatment, even if the natural result of the refusal would be death, prevails.

Justice Cerrato in his decision raised the spectre that Daniel's right to self-determination might be counterbalanced by his age and medical condition, i.e., the absence of a terminal illness. We do not believe that the panoply of rights associated with a competent person's right to self-determination is limited by reason of a person's age or medical condition. While the patient's age is a factor to be considered in determining whether he had made an informed decision to forgo treatment, it is by no means determinative. The decisional law confirms that the desires of a young, generally healthy person to refuse treatment are entitled to the same protection as those of an elderly, terminally ill individual *(see, e.g., Matter of Hall Hosp. [Cinque]*, 116 Misc 2d 477 [Spatt, J.] [41-year-old man]; *Bouvia v Superior Ct.,* 179 Cal App 3d 1127, 225 Cal Rptr 297, *supra* [28-year-old woman]; *Matter of Jobes,* 210 NJ Super 543, 510 A2d 133 [30-year-old woman]; *Severns v Wilmington Med. Center,* 425 A2d 156, *supra* [55-year-old woman]; *Matter of Quinlan,* 70 NJ 10, 355 A2d 647, *supra* [21-year-old

woman]; *accord, Matter of Conroy,* 98 NJ 321, 355, 486 A2d 1209, 1226, *supra).* Furthermore, while the terminal nature of an illness may be relevant in treatment decisions made by a competent person, it is of little practical relevance in cases involving a person existing in a chronic vegetative state with no hope of recovery. In fact, the absence of a terminal illness may serve to reinforce the decision to discontinue life-sustaining treatment because of the potentially long and indefinite period that a young person without a terminal illness may continue to live in a vegetative condition, deriving no benefit other than mere existence from the life-sustaining treatment, but suffering the continued indignities and dehumanization created by his or her helplessness.

We support the individual's right to choose to refuse treatment and thereby live out his life in dignity and peace for whatever period of time remains. There is no practical or logical reason to limit the exercise of the right of self-determination with respect to one's body to terminally ill patients. Although the absence of a terminal illness may implicate the State's concern to preserve life, this interest is outweighed by the individual's right to avoid being preserved in a vegetative condition which, when he was mentally competent, he considered degrading and without human dignity *(accord, Brophy v New England Sinai Hosp.,* 398 Mass 417, 434-435, 497 NE2d 626, 635-636, *supra; Matter of Conroy,* 98 NJ 321, 355, 486 A2d 1209, 1226, *supra).* The ultimate decision to refuse treatment is for the patient alone to reach. The courts should, in the absence of countervailing State interests, honor the patient's wishes.

In sum, Daniel has a common-law right to refuse medical treatment in the form of nutrition and hydration by artificial means. Moreover, we agree with Justice Cerrato that Daniel's desires, expressed when he was competent, to exercise that right and decline life-sustaining treatment under the current conditions, was established by clear and convincing evidence at the hearing.

## VI

The only remaining question is whether there is some compelling State interest which overrides Daniel's right to self-determination with respect to his body. Implicit in this inquiry is the axiom that the common-law right to refuse medical treatment is not absolute and may, in some cases,

yield to a compelling State interest *(Matter of Eichner [Fox],* 73 AD2d 431, 465-467, *mod* 52 NY2d 363, *supra).* Courts and commentators have commonly identified four compelling State interests in medical treatment decisions: (1) the preservation of life; (2) the prevention of suicide; (3) the protection of innocent third parties; and (4) the maintenance of the ethical integrity of the medical profession *(see, e.g., Matter of Eichner [Fox], supra; Brophy v New England Sinai Hosp.,* 398 Mass 417, 432, 497 NE2d 626, 634, *supra; Matter of Conroy,* 98 NJ 321, 349, 486 A2d 1209, 1223; *Leach v Akron Gen. Med. Center,* 68 Ohio Misc 1, 426 NE2d 809, 814; Note, *In re Conroy: A Limited Right to Withhold or Withdraw Artificial Nourishment,* 6 Pace L Rev 219, 224-227 [1986]; Merritt, *Equality for the Elderly Incompetent: A Proposal for Dignified Death,* 39 Stan L Rev 689, 702-704 [1987]; Calabrese, *In re Storar: The Right to Die and Incompetent Patients,* 43 U Pitt L Rev 1087, 1092 [1982]). It is, therefore, incumbent upon this court to balance Daniel's right to refuse treatment against the four identified categories of relevant State interests.

The State's interest in preserving life is commonly considered the most significant of the four State interests *(see, e.g., Matter of Eichner [Fox], supra; Brophy v New England Sinai Hosp., supra; Matter of Conroy, supra).* In balancing the State's interest against the individual's right not to be kept alive in a chronic vegetative state, "the State's interest * * * weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims" *(Matter of Quinlan,* 70 NJ 10, 41, 355 A2d 647, 664; *see also, Foody v Manchester Mem. Hosp.,* 40 Conn Supp 127, 134, 482 A2d 713, 718-719; *Matter of Spring,* 380 Mass 629, 405 NE2d 115, 119, *supra; Superintendent of Belchertown State School v Saikewicz,* 373 Mass 728, 740, 370 NE2d 417, 425-426, *supra).* The dilemma faced by the courts on applications to discontinue treatment of a person in a chronic vegetative state was expressed in the opinion of this court in *Matter of Eichner (Fox) (supra,* at 465). We found upon those facts that the desire of Brother Fox to die with dignity outweighed the State interest in the preservation of life, reasoning that (at 465): "the patient in a permanent vegetative coma has no hope of recovery and merely lies, trapped in a technological limbo, awaiting the inevitable. As a matter of established fact, such a patient has *no* health and, in the true sense, no life, for the State to protect. Thus, the use of a respirator, or any other extraordinary means of life support, *under these circum-*

*stances,* does not serve to advance the State's interest in protecting health or life". By extension of that reasoning, the State's interest in the preservation of life does not defeat the right to bodily self-determination asserted by Daniel in this application to discontinue the use of the feeding and hydration tubes. Daniel is, like Brother Fox, in a persistent vegetative state from which he will not emerge and has no life for the State to protect in the usual sense. Clearly, there is no benefit to the State in prolonging Daniel's existence under circumstances he would have found demeaning and degrading to his humanity and which would serve merely to lessen the value of his life by denying him the right to choose the course of his medical treatment *(Matter of Conroy,* 98 NJ 321, 350, 486 A2d 1209, 1223-1224, *supra; Superintendent of Belchertown State School v Saikewicz,* 373 Mass 728, 742, 370 NE2d 417, 426, *supra).*

In conjunction with the State's interest in preserving life, the State has a particular interest in preventing suicide. However, suicide requires a specific intent to die which has generally been found lacking in patients who refuse artificial life-sustaining medical treatment *(see, e.g., Matter of Eichner [Fox], supra,* at 466-467; *Matter of Conroy,* 98 NJ 321, 350-351, 486 A2d 1209, 1224, *supra; Superintendent of Belchertown State School v Saikewicz,* 373 Mass 728, 743, n 11, 370 NE2d 417, 426, n 11, *supra; Matter of Colyer,* 99 Wash 2d 114, 123, 660 P2d 738, 743). Instead, a person's desire to have artificial life-support systems terminated evinces only an intent to live free of unwanted mechanical devices and permit the processes of nature to run their course *(see, e.g., Matter of Eichner [Fox], supra,* at 467; *Brophy v New England Sinai Hosp.,* 398 Mass 417, 439, 497 NE2d 626, 638, *supra; Matter of Conroy,* 98 NJ 321, 350-351, 486 A2d 1209, 1224, *supra; Satz v Perlmutter,* 362 So 2d 160, 162, *supra).* We conclude, therefore, that the State's interests in preventing suicide is not applicable at bar. Daniel's death, when it occurs, will be the end result of his inability to chew and swallow spontaneously and not the result of a self-inflicted injury.[8]

---

**8.** In *Matter of Vogel* (134 Misc 2d 395 *supra)* Justice Alfred S. Robbins of the Supreme Court, Nassau County, refused to grant an application to remove a gastric nasal tube from a comatose patient with no hope of recovery. To do so, the court concluded, would be to embrace a concept of "sympathetic euthanasia" by permitting the patient to starve to death. We decline to follow that reasoning in the case at bar.

Compare the case of *Matter of Von Holden v Chapman* (87 AD2d 66)

The third asserted State interest in overriding a patient's right to refuse medical treatment is the interest in protecting innocent third parties, particularly minor children, and is rooted in the concept of *parens patriae (see,* Note, *In re Conroy: A Limited Right to Withhold or Withdraw Artificial Nourishment,* 6 Pace L Rev 219, 225 [1986]). The State's interest may well be superior to an adult's right of self-determination when the exercise of that right deprives dependents of a source of support and care *(see, e.g., Matter of Eichner [Fox], supra; Matter of Conroy,* 98 NJ 321, 353, 486 A2d 1209, 1225, *supra; Leach v Akron Gen. Med. Center,* 68 Ohio Misc 1, 426 NE2d 809, 814, *supra).* In the case at bar, Daniel has no dependents. The only persons who the State may have an interest in protecting, Daniel's wife and mother, are the proponents of the request to discontinue treatment. Therefore, the interest in the protection of third parties does not exist in this case.

The fourth and final State interest asserted as a limitation on a patient's right of self-determination is the interest in safeguarding the ethical integrity of the medical profession. This interest has largely been overcome or at least lessened by the prevailing medical ethical standards which do not require medical intervention at all costs *(see generally, Matter of Storar,* 52 NY2d 363, 385, n 3, *supra,* and sources cited therein; *Brophy v New England Sinai Hosp.,* 398 Mass 417, 439, n 38, 497 NE2d 626, 638, n 38, *supra; Matter of Conroy,* 98 NJ 321, 351, 486 A2d 1209, 1224-1225, *supra;* Note, *In re Conroy: A Limited Right to. Withhold or Withdraw Artificial Nourishment,* 6 Pace L Rev 219, 226 [1986]; President's Commn for the Study of Ethical Problems in Medicine and Biomedical Behavioral Research, Deciding to Forego Life-Sustaining Treatment). Indeed, if a physician follows the choice of a competent adult patient who refuses medial treatment, he cannot be deemed to have violated his professional responsibilities so long as he advises the patient of the risks of foregoing medical treatment. As the *Conroy* court stated: "[I]f the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as

---

where the court upheld the right of a State psychiatric facility to force feed an inmate on a hunger strike in furtherance of the State's interest in preventing suicide. There, the inmate was suffering from no infirmity and was not declining life-sustaining treatment necessary because of a natural degenerative condition. Under those circumstances, the inmate's refusal to eat constituted an attempt to commit suicide.

a whole" *(Matter of Conroy,* 98 NJ 321, 352-353, 486 A2d 1209, 1225, *supra; see, Matter of Colyer, supra,* 660 P2d, at 743-744). The *Brophy* court also observed that directing the discontinuance of life-sustaining medical treatment would not intrude upon a hospital's ethical integrity if the court were to refrain from directly forcing a hospital to affirmatively act to terminate the life-sustaining treatment *(Brophy v New England Sinai Hosp.,* 398 Mass 417, 440, 497 NE2d 626, 638-639, *supra).* While the Medical Center urges in its brief on the instant appeal that this court should not compel it to act against its will to withdraw the nourishment and hydration by artificial means presently being provided to Daniel, it indicated at oral argument on this matter that its position on this issue was not intractable and it might be willing to remove the feeding tubes if an order so directing issued from this court. Because of the equivocal nature of the Medical Center's position as to whether such an action would violate its ethical standards, our directive will be drawn in the alternative so that the Medical Center will not be forced to act contrary to its view of its ethical duty toward its patients.

In summary, we uphold Justice Cerrato's factual determination which found by clear and convincing evidence that Daniel Delio made a solemn, intelligent determination while competent that he would refuse to be maintained in a chronic vegetative state with nutrition and hydration tubes. We find, moreover, that no compelling countervailing State interest exists to override Daniel's common-law right to refuse treatment and, therefore, his exercise of that right must be honored.

Accordingly, the judgment appealed from should be reversed, and the conservator Julianne Delio should be authorized to direct a discontinuance of all medical treatment to the conservatee, Daniel Delio, including the termination of nutrition and hydration by artificial means. The Medical Center should be directed to either assist in the discontinuance of treatment or to take whatever steps are reasonably necessary to assist in the conservatee's transfer to a suitable facility or to his home where his wishes may be effectuated.

Mollen, P. J., Brown and Rubin, JJ., concur.

Ordered that the judgment is reversed, on the law, without costs or disbursements, and that branch of the petitioner's petition which was for authorization to direct the Westchester County Medical Center to stop all treatment for her conserva-

tee Daniel Delio including the provision of nutrition and hydration by artificial means is granted, and, in the event the Westchester County Medical Center declines to follow the petitioner's instructions to discontinue all treatment, it shall take whatever steps are necessary to assist the petitioner in transferring the conservatee to his home or to a facility where the petitioner's instructions to discontinue all treatment will be carried out.