Bernard A. McCaffrey, J.
This matter involves a petition by the administrator on duty at the Long Island Jewish-Hillside Medical Center for an order of this court authorizing medical treatment to a Harry Levitt, a patient therein.
Upon the filing of the petition on March 6, 1973, the court forthwith convened a hearing of Special Term, Part II, of this court on this petition at Long Island Jewish-Hillside Medical Center located at 270-05 76th. Avenue, New Hyde Park, New York.
*396 Dr. Randey Greenhouse, a member of the medical staff at Long Island J ewish-Hillside Medical Center, testified that Harry Levitt was presently a patient at the said hospital and was admitted on February 26, 1973 from Glen Oaks Nursing Home, and at that time, the patient, who is 84 years of age, was suffering from severe dehydration. Upon admission, a case of gangrene was also diagnosed and it was further determined that Mr. Levitt was suffering from arterial sclerotic peripheral vascular disease. The latter illness has resulted in Mr. Levitt, for all intents and purposes, being unable to make , judgments relative to his health. The gangrene which was diagnosed upon his admission became significantly worse on March 1, 1973 and attempts to treat it have been unsuccessful, and the said condition has rapidly worsened.
Dr. Greenhouse further testified that, in addition to staff physicians, he consulted with the patient’s physician, Dr. Edward Hotchkiss, and also with Dr. Dallas Lewis, a surgeon consulted by Dr. Hotchkiss. That it is the medical opinion of all of them that surgery must be performed on the patient, Harry Levitt, for the amputation of his left leg above the knee within the next 16 to 20 hours at the latest in order to save his life.
The petition stated that, based upon the information received from the patient and the nursing home, the only living relative or next of kin of Mr. Levitt is his sister, Helen Finkelburg, who stated that she could not assume the responsibility of making" the decision whether or not to consent to the necessary operation.
At the hearing Dr. Greenhouse testified that he consulted with Mrs. Finkelburg’s personal physician, Dr. Julius Buch, who stated that based on her medical history she should not have to make the decision concerning the consent, for to do so probably would have a severe adverse effect upon her own health. Dr. Greenhouse also testified, evaluating Mr. Levitt’s condition, that he and all the attending physicians considered Mr. Levitt to be a good operable risk in connection with the contemplated operation.
The court takes note that once Mr. Levitt became a patient at Long Island J ewish-Hillside Medical Center, it was the responsibility of the hospital and doctors to treat him. However, without obtaining a consent the hospital and doctors were faced with a dilemma of subjecting themselves to liability for damages if they proceeded with an unauthorized operation, or, to do nothing and let him die. The alternative was to seek the aid of the court. The court notes that Long. Island J ewish-Hillside Medical Center is a large active institution treating thousands of patients, and in this respect the court commends the Long Island Jewish-Hill *397 side Medical Center and its staff for the value it has placed upon the life or death of one human being, particularly in this instance where the individual concerned has attained the age of 84 years. For though it has been said that the death of one person affects us all, so too even to a greater degree does the concern that is shown for the maintaining of an individual human life affect not only us as individuals now, but also the very structure of our future society.
There is an inherent responsibility placed upon a court to exercise the discretion vested in it to recognize and act in those situations where life and death of an individual are involved and, though it must be careful not to exercise this discretion where it would be contrary to the expressed wishes of an adult individual. It should, where the evidence clearly supports a finding that the operation should be performed, then act decisively, for justice is not served if the court in the process of strictly adhering to legal procedures allows the individual to die when he coiild have been saved by decisive action.
Dr. Harvey B. Etess, chief resident in charge of the medical service, also testified as to the facts as testified by Dr. Greenhouse. He further testified that on the morning of March 6, 1973, he had had a conversation with Mr,. Levitt and stated, though previously informed by Mr. Levitt’s relatives that he did not want to have the operation, that he now would consent to it if it would mean it would save his life. However, because of Mr. Levitt’s physical condition, it was also his medical opinion that for all intents and purposes he was unable to make judgments relative to his health and, therefore, though it was his opinion that Mr. Levitt did at the time of this conversation understand the staff and agreed to the operation, his medical condition was rapidly deteriorating and he too agreed the petition to the court for authorization was necessary under these circumstances.
Therefore, the hospital seeks the aid of the court in that it is faced with a situation where a life is at stake and to their knowledge at the time that they made the petition there was no one competent or willing to give consent and, therefore, unless the court authorizes the operation there is no question but Mr. Levitt would shortly die.
' The general rule is that as to adults, there must be consent, either expressed or implied before a physician may perform an operation. The court stated in Schloendorff v. Society of New York Hosp. (211 N. Y. 125, 129): “ Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an opera *398 tion without his patient’s consent, commits an assault, for which he is liable in damages. * * * This is true except in cases of emergency where the patient is unconscious and where it is necessary to operate before consent can be obtained.”
An emergency condition may justify an implication of consent. If a patient gives actual consent to some treatment and during the course of the treatment an unanticipated emergency condition arises which threatens the patient’s life, the consent of the patient may often be implied. Justice Pittoui so held in Matter of Collins v. Davis (44 Misc 2d 622).
In the Matter of President & Directors of Georgetown Coll. (331 F. 2d 1000 [D. C. C. R.]) the court approved the application of Georgetown Hospital to give a series of transfusions 1 ‘ to save ” the patient’s life, even though the adult patient and her husband expressed opposition on religious grounds, the court holding: That the patient (p. 1007) “was not in a mental condition to make a decision ’ ’; that the patient had sought medical attention placing on the hospital the legal responsibility for her proper care; that the patient was the mother of a seven-month child and the State “ as parens patriae ” (p. 1008) will not allow a parent to abandon a child; that while the patient did not consent to a transfusion, on religious grounds, ,she had no wish to be a martyr, and she indicated that if the court ordered the transfusion it would not then be her responsibility.
In the matter now before the court we are not involved with a situation where' the patient or his relatives have objected to the operation on the basis of religious beliefs or other scruples, nor is it a situation where the adult patient is competent and in a rational manner expressed his opposition to an operation. For based upon all the testimony adduced at the said hearing in connection with this petition, it is the court’s finding that at no time did Mr. Levitt, while competent, clearly express in a rational manner his opposition to the operation. Though there was some testimony that Mr. Levitt expressed some opposition concerning this matter to some of his relatives, it at best can be taken as an expression by him that he would like not to have his leg removed. However, the more controlling testimony, that of the attending physicians, who testified that as recently as the morning of the hearing, March 6, 1973, and which would be subsequent to any conversations with any of his relatives, Mr. Levitt, after being presented with the facts concerning his medical condition and that if the leg were not removed he would die, advised the doctors that though he did not want to have his leg removed he would agree to the operatic!) for the removal of the leg if it were necessary to save his life.
*399 During the hearing Dr. Greenhouse informed the court that a niece of Mr. Levitt, after visiting the patient on March 5,1973, stated to some unidentified members of the staff that Mr. Levitt had expressed objection to having his leg removed. At this time the court directed the hospital administrator to obtain the name of the niece who had visited Mr. Levitt.
The court notes that at times emergency conditions, particularly where it involves the life and death of an individual, require that usual practices and procedures be modified and, therefore, a conference telephone call to New York City was immediately arranged between the niece, Helen Putterman, the court, the court reporter, the court clerk, the hospital administrator, the attending physician, and Mr. Melvin B. Buskin, counsel for the hospital. The court explained to the niece the emergency situation that existed and identified the other parties on the conference call. The court thereupon had her sworn by phone and fully explained the situation concerning her uncle. After being' advised as to the medical testimony given to the court that unless the leg were amputated within the next 24 hours her uncle would die, she was advised of the medical testimony that was given to the court that all factors considered her uncle was considered a good operable risk, and she was further advised as to her aunt’s inability to accept the responsibility to consent to the operation. The court thereupon, with her consent, appointed her as guardian for this purpose and she thereupon gave her consent to the operation. The court authorized the Long Island Jewish-Hillside Medical Center and the physicians to proceed with the necessary operation amputating the left leg above the knee, and provided for the subsequent entry of the formal order and the filing of the guardian consent forms, all in accordance with this decision.