In the Matter of WESTCHESTER COUNTY MEDICAL CENTER, on Behalf of MARY O'CONNOR, Appellant. HELEN A. HALL et al., Respondents.

Second Department, August 16, 1988

## APPEARANCES OF COUNSEL

*Marilyn J. Slatter, County Attorney (Kenneth E. Powell, Carol L. Van Scoyoc* and *Cataldo F. Fazio* of counsel), for appellant.

*Cerrato, Sweeney, Cohn, Stahl & Vaccaro (Leo A. Sweeney, Julius W. Cohn* and *Wayne H. Spector* of counsel), for respondents.

*Fenella Rouse, Elena N. Cohen* and *M. Rose Gasner (Zavin, Sinnreich & Wasserman [Richard Wasserman]* of counsel), for Society for the Right to Die, Inc., *amicus curiae.* (One brief filed.)

## OPINION OF THE COURT

MANGANO, J. P.

The crucial question to be resolved on the instant appeal is whether clear and convincing evidence was adduced at a hearing to establish that the presently incompetent patient, Mary O'Connor, expressed a desire, when she was competent, to exercise her common-law right to refuse all artificial life support systems, which would include nasogastric feeding and intravenous feeding. Our review of the record compels us to hold that this question must be answered in the affirmative.

I

The health of Mary O'Connor, a 77-year-old widow, began to deteriorate in July 1985 when she suffered the first of a series of progressively debilitating strokes. Her last stroke, in December 1987, affected her ability to swallow, and, after several months of hospitalization at Dobbs Ferry Hospital, she was transferred in February 1988 to the Ruth Taylor Institute, a nursing home associated with the Westchester County Medical Center (hereinafter WCMC). At the time of her admission to the Ruth Taylor Institute, the respondents Helen A. Hall and Joan Flemming, Mrs. O'Connor's daughters, submitted to the Institute a document, signed by them, which indicated that it was their mother's wish that no artificial life support systems be started or maintained to sustain her life. On June 20, 1988, Mrs. O'Connor was transferred to WCMC, and was diagnosed as having multiinfarct dementia, dehydration and sepsis. Upon her admission to WCMC, it was determined that an attempt to feed Mrs. O'Connor through a puree diet would be futile since by then she had lost her ability to swallow.

Accordingly, she was put on intravenous feeding. Mrs. O'Connor is neither comatose nor in a persistent vegetative state. However, she only responds sporadically to some simple questions (although not always appropriately), and obeys some very simple commands. It is conceded by all the parties to this proceeding, as well as by both medical experts who testified at the hearing, that Mrs. O'Connor is not competent to make any decisions regarding her medical treatment. In addition, the record demonstrates, through the testimony of the medical experts called by both sides in this dispute, that the damage suffered by Mrs. O'Connor as a result of the multiple strokes is "irreparable", that there is no chance for "a meaningful mental status recovery", and that "she will never improve from" her present condition.

The intravenous feeding of Mrs. O'Connor, at best, will be effective for only several weeks, due to its relatively low caloric content, and the progressive obliteration of Mrs. O'Connor's venous access. As a result, WCMC commenced the instant proceeding in mid-July 1988, *inter alia,* for permission to insert a nasogastric tube so that nourishment could be delivered directly to her digestive tract. Mrs. O'Connor's attending physician was of the view that if the nasogastric tube were not inserted at the appropriate time, and the intravenous feeding were discontinued, Mrs. O'Connor would die in approximately 7 to 10 days. On the other hand, the insertion of the nasogastric tube would, in the attending physician's "guess", or "top of the head opinion", prolong Mrs. O'Connor's life, for several months or perhaps "a year or two". The application of WCMC was opposed by the respondents Hall and Flemming, who during the hearing, sought to have the intravenous feeding discontinued.

After a full hearing on the issues, the Supreme Court, Westchester County, by judgment dated July 26, 1988, denied the petition of WCMC, and directed that the intravenous feeding be discontinued. The Supreme Court found that there was clear and convincing evidence that Mary O'Connor, when competent, expressed a desire not to be maintained by artificial life support systems in her current condition, and that the effect of her expressed desire was to include nasogastric tube and intravenous feeding.*

---

* In addressing the likelihood, as testified to by Mrs. O'Connor's attending physician, that she would experience pain if the intravenous feeding was discontinued, the Supreme Court accurately noted that the likelihood of

## II

In the seminal case of *Matter of Storar* (52 NY2d 363), and its companion case *Matter of Eichner v Dillon* (52 NY2d 363), the Court of Appeals held, in reliance on the common-law right of every person of adult years and sound mind to determine what should be done to his body *(see, Schloendorff v Society of N. Y. Hosp.,* 211 NY 125), that an incompetent person has the common-law right to have life sustaining medical treatment terminated where it is established by clear and convincing evidence that the person, when competent, expressed the desire to invoke that right, and where there are no countervailing compelling State interests present *(Matter of Storar, supra,* at 379; *see, Matter of Delio v Westchester County Med. Center,* 129 AD2d 1). Moreover, in *Matter of Delio v Westchester County Med. Center (supra),* we specifically held that the withdrawal or withholding of feeding by artificial means, including nasogastric tubes and intravenous feeding, "should be evaluated * * * as any other medical procedure" *(Matter of Delio v Westchester County Med. Center; supra,* at 19). Specifically, this court stated *(Matter of Delio v Westchester County Med. Center, supra,* at 19): "we view nutrition and hydration by artificial means as being the same as the use of a respirator or other form of life support equipment".

Accordingly, for the purposes of our analysis in the instant proceeding, we fail to perceive any distinction between a nasogastric tube and intravenous feeding *(see also, Matter of Conroy,* 98 NJ 321, 486 A2d 1209). Moreover, we do not find persuasive the argument that life sustaining treatment may not be terminated in the instant proceeding simply because Mrs. O'Connor is not comatose or in a chronic vegetative state. As this court stated in *Matter of Delio v Westchester County Med. Center (supra,* at 21): "We do not believe that the panoply of rights associated with a competent person's right to self-determination is limited by reason of a person's age or medical condition". The crucial facts in the case at bar are that Mrs. O'Connor has been rendered permanently incompetent and that she is being maintained on an artificial life sustaining system *(Matter of Delio v Westchester County Med. Center, supra,* at 21). Accordingly, we must legally evaluate her desires, if any, which were expressed while she was

---

pain was disputed by the respondents' medical expert who also testified that any pain could be alleviated by pain-killers.

competent, with respect to artificial life sustaining systems. It is to that issue that we now turn.

## III

It should be noted at the outset that Mrs. O'Connor, during the course of her life, devoted a great deal of time to caring for several extremely ill relatives. Specifically, Mrs. O'Connor took care of all of her husband's needs for two years prior to his death from cancer in 1967. In addition, Mrs. O'Connor had two brothers, who died in 1975 and 1977, respectively, both from cancer, and Mrs. O'Connor spent many hours caring for them as well. Finally, Mrs. O'Connor herself worked at Jacobi Hospital in the emergency room as a clerk and then transferred to the Department of Laboratories and Medicine where she was director of laboratory purchasing. Viewed within this context, the testimony adduced at the hearing from James Lampasso, a friend who was an assistant director of clinical pathology at Jacobi Hospital and who knew Mrs. O'Connor professionally and socially for 25 years, and from Mrs. O'Connor's daughters, who are both licensed practical nurses, is most illuminating.

James Lampasso's father was suffering from cancer in 1969. During the course of a conversation with Mrs. O'Connor, James Lampasso expressed his own father's desire not to be kept alive by artificial methods. In response, Mrs. O'Connor stated: "Yes * * * I would never want to be a burden on anyone * * * nature should take its course and not use further artificial means". James Lampasso discussed this matter again with Mrs. O'Connor "around 1973 or '74", and her feelings remained the same.

The testimony of Mrs. O'Connor's daughters was equally, if not more, compelling. In November 1984, after recovering from a heart attack, Mrs. O'Connor stated to her daughters that: "she was very glad to be home, very glad to be out of the hospital and hope[d] she would never have to be back in one again and would never want *any* sort of * * * life support systems to maintain or prolong her life" (emphasis supplied). Mrs. O'Connor reiterated her position during Christmas of that year when she told her daughters that: "in the event she became ill and unable to care for herself * * * she did not want *any* type of life support or life sustaining system" (emphasis supplied).

Under these circumstances, we agree with the Supreme

Court that Mrs. O'Connor's desires, expressed when she was competent, to decline any life sustaining treatment, including a nasogastric tube and intravenous feeding, in her current condition, was established by clear and convincing evidence at the hearing. In so holding, we reject the petitioner's argument that the petition must be granted because Mrs. O'Connor did not specifically delineate, when competent, the particular artificial life support systems that she wished to have withdrawn or withheld. Such an argument places an unfair burden on those who are not well versed in the area of modern medical technology and, in a broader sense, reflects a failure on its proponent's part, to appreciate the constant advances that are made in the area of medical technology.

Accordingly, the judgment appealed from should be affirmed.

BROWN, J. (dissenting). I cannot agree that, on the record before us, there exists sufficient proof that Mary O'Connor, when competent, had expressed a clear desire to forego intravenous and nasogastric feeding under the circumstances of her present physical condition.

There is, of course, no doubt that the use of artificial means of hydration and nourishment, whether by intravenous infusions or by way of a feeding tube, are now considered to be a means of life support the use of which a patient can decline as part of his or her right to refuse medical treatment *(see, Matter of Delio v Westchester County Med. Center,* 129 AD2d 1). However, there still must be clear and convincing evidence that, when competent, the patient made a conscious decision to refuse such treatment under the circumstances of his or her condition at the time of the application under consideration *(see, Matter of Storar,* 52 NY2d 363, *cert denied* 454 US 858; *Matter of Delio v Westchester County Med. Center, supra).*

While the requisite clear and convincing standard may not be as high as that of proof beyond a reasonable doubt, it still necessitates an evidentiary showing that is clear, positive and substantial *(see, Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 219-220). The clear and convincing standard exists so as to " 'impress the factfinder with the importance of the decision' " *(Matter of Storar, supra,* at 379, quoting from *Addington v Texas,* 441 US 418, 427), and it " ' "forbids relief whenever the evidence is loose, equivocal or contradictory" ' " *(see, Matter of Storar, supra,* at 379, quoting from *Backer Mgt. Corp. v Acme Quilting Co., supra,* at 220). That the evidence

merely preponderates in favor of the patient's exercise of his or her right to refuse medical treatment is not sufficient *(see, Matter of Storar, supra,* at 379).

In the instant case there was testimony by Mrs. O'Connor's friend and former co-worker James Lampasso, that in 1969 his father was dying of brain cancer. Mrs. O'Connor's husband had previously died under similar circumstances. Mr. Lampasso had a conversation with Mrs. O'Connor about his father's illness, during which she told him that she would "never want to be a burden on anyone" and would never want "to lose [her] dignity" before she passed away. He further testified that Mrs. O'Connor also indicated that if she became totally incapacitated, nature should be allowed to take its course and artificial means should not be used to prolong her life. He added that she had said that it was "monstrous" to keep someone alive by "artificial means" if he or she was not going to get better. Mr. Lampasso, who stated that he had last discussed the issue with Mrs. O'Connor in 1973 or 1974, acknowledged, however, that at no time did Mrs. O'Connor ever mention any specific type of artificial life support.

Helen A. Hall, Mrs. O'Connor's daughter, testified that in November 1984, her mother had been hospitalized as a result of congestive heart failure, and that following her release from the hospital she had told her daughters that if she were ever hospitalized again she would not want "any sort of intervention" or "any sort of life support systems" to "maintain or prolong her life." However, Mrs. Hall could not state with any certainty what her mother meant by the term "life support system" and, indeed, when asked if she knew what her mother would want if her choices were to have a nasogastric tube inserted or to die of thirst or hunger, Mrs. Hall responded, "No, I don't". Joan Fleming, Mrs. O'Connor's other daughter, agreed with her sister that their mother had expressed a desire to forego artificial "life support", but similarly admitted that she did not know whether the use of that term was intended by Mrs. O'Connor to include artificial means of hydration and nourishment.

While Mrs. O'Connor's daughters contend that their mother's statements, when competent, evinced a clear expression to forego the use of any artificial means of life support, their actions following their mother's admission to the hospital demonstrate, to the contrary, that they did not know whether, or truly believe that, their mother's desires included the withdrawal of intravenous feeding and the withholding of a

nasogastric feeding tube. Mrs. O'Connor was admitted to the Westchester County Medical Center on June 20, 1988, at which time the intravenous feeding was immediately commenced. Although Mrs. O'Connor's daughters were aware of the fact that their mother was being fed intravenously, they never requested termination of that procedure nor did they voice an opinion to the effect that their mother would not want to be so fed. The intravenous feeding continued without objection for approximately one month prior to the commencement of the court hearing on the Medical Center's application and, even then, Mrs. O'Connor's daughters did not request the withdrawal of intravenous feeding. It was not until the Trial Judge, toward the end of the hearing, suggested that he might be amenable to the granting of such relief that they finally applied therefor.

In previous cases where the discontinuance of artificial life support has been authorized there has been unequivocal evidence that the patient, when competent, had carefully reflected upon the subject, clearly expressed his views and concluded not to have his life prolonged by life preserving medical means under specific circumstances (see, Matter of Eichner v Dillon, 52 NY2d 363, decided with Matter of Storar, supra). In Eichner, Brother Joseph Fox suffered substantial brain damage as a result of cardiac arrest during routine surgery. He lost his ability to breathe spontaneously and was placed on a respirator. The director of the religious society of which Brother Fox was a member applied to be appointed committee for his person and thereafter asked for an order directing the removal of the respirator. At the hearing the evidence indicated that Brother Fox had first expressed his views regarding artificial life support in 1976 when the Karen Ann Quinlan case (Matter of Quinlan, 70 NJ 10, 355 A2d 647) was receiving much publicity. During formal discussions of the issue conducted by his religious order, Brother Fox had expressed the view that he would not want a respirator used if he was ever in similar circumstances to Ms. Quinlan, who was in a coma and being maintained on a respirator. Several years later, and only a few months before his hospitalization, Brother Fox reaffirmed those views. The Court of Appeals concluded that Brother Fox's statements were "obviously solemn pronouncements and not casual remarks" (Matter of Eichner, supra, at 380) and that there was "no need to speculate as to whether he would want this particular medical procedure to be discontinued under [the] circumstances" (Mat-

ter of Eichner, supra, at 380) since what had occurred to him was nearly "identical to what happened in the Karen Ann Quinlan case, which had originally prompted his decision" *(Matter of Eichner, supra, at 380)*.

Similarly, in *Matter of Delio v Westchester County Med. Center* (129 AD2d 1, 6, *supra)*, the patient, Daniel Delio, was a "markedly opinionated individual with clearly expressed ideas and strong views on the subject of maintaining an incompetent * * * person on life-sustaining mechanisms". Although he had not executed a living will, Mr. Delio had "extracted" promises from his wife that if he were ever in a comatose condition she would take "every possible step to prevent the preservation of his life by artificial means" *(Matter of Delio v Westchester County Med. Center, supra, at 6, 7)*. The *Delio* case, like the instant one, involved a request to discontinue the use of a feeding tube. However, in *Delio,* the patient had in fact expressed his view that it was "horrible" and "appalling" to keep a person alive "in a vegetative state by artificial infusions of medication and nutrition" *(Matter of Delio v Westchester County Med. Center, supra, at 7)*.

In the case before us, the evidence of Mrs. O'Connor's views with regard to the use of medical means of hydration and nourishment is, at best, equivocal and does not, in my judgment, rise to the required clear and convincing level of proof. While Mrs. O'Connor may have expressed a desire to forego the use of artificial means of life support, there was no indication that she had carefully reflected on the subject *(see, Matter of Alderson [Kimbrough],* NYLJ Aug. 9, 1988, at 18, col 2)*. While Mrs. O'Connor's statements may not have been "casual remarks", they were made at time when she had recently experienced the loss of a loved one or shortly after her own hospitalization and may have reflected an emotional reaction to a perceived fear rather than a solemn pronouncement or clearly expressed decision regarding a future course of medical treatment. And the failure of Mrs. O'Connor's daughters to object to commencement, and continuance, of intravenous feeding until prompted by the court indicates that they themselves were not fully cognizant of their mother's intentions.

While I do not question the sincerity of Mrs. O'Connor's daughters in their effort to give effect to what they may believe are their mother's wishes, the testimony presented on this record is simply not that clear, positive or substantial as to lead me to conclude that Mrs. O'Connor, under her present

condition and circumstances, would refuse hydration and nourishment by artificial means. Accordingly, I would reverse the judgment appealed from, on the facts, grant the Medical Center's petition for permission to insert a nasogastric feeding tube, and deny the respondents' application to discontinue intravenous feeding.

BALLETTA, J. (dissenting). I concur with Justice Brown that the proof is not clear and convincing as to the wishes of Mary O'Connor and that the judgment of the trial court should be reversed on the facts of this case.

I write separately to clarify my position that this case should be reversed not only on the facts, but that reversal on the law is also required. In my view, the case law in this State does not support the position of the respondents. There are no appellate court decisions in New York which have authorized the withholding or withdrawal of life support systems to a patient who is not comatose, in a persistent vegetative state, or terminally ill.

The record before this court clearly shows that Mary O'Connor's condition improved after entry into the hospital and being given nutrition through an intravenous tube. She became "more alert, arousable * * * awake and follows simple commands". She is able to squeeze her doctor's hand on request and responds verbally to her name. She answers simple questions with a "Yes" or "No". She is awake and responsive and can feel pain and discomfort. There is uncontroverted testimony that Mrs. O'Connor attempted to sit up at her doctor's request and was able to roll over "somewhat" to enable the doctor to listen to her lungs.

Dr. Sivak, the attending physician, noted that Mary O'Connor is not in a "persistent vegetative state", and, that, while she suffers from severe dementia, she is awake and responsive. Dr. Sivak further differentiated Mrs. O'Connor's condition from that of a patient in a persistent vegetative state, saying that a patient in a persistent vegetative state cannot feel pain or discomfort and that his or her condition is irreversible, while in Mrs. O'Connor's case there was some room for improvement, and she can feel pain and discomfort.

Dr. Wasserman, a neurologist engaged by the respondents to examine Mary O'Connor, acknowledged that she was conscious and that she was able to tell him her name, although her speech was slow and halting. He further testified that her speech was intelligible 50% or 60% of the time, and that she

obeyed simple commands correctly about 50% of the time. Dr. Wasserman also believed that Mrs. O'Connor was cognizant of where she was.

It is clear that the facts and circumstances of this case as to the condition of the patient are substantially different from the facts in the *Matter of Delio v Westchester County Med. Center* (129 AD2d 1) case relied upon by the majority. The decision of this court in the *Delio* case was limited to the particular facts of that case; the court there stated that: "We conclude that, *upon the facts of this case,* the clearly expressed desires of the individual to die with dignity should be honored" *(Matter of Delio v Westchester County Med. Center, supra,* at 3 [emphasis added]). However, in that case, Mr. Delio existed in a chronic vegetative state—he had no cognitive awareness, had no hope of improvement, had severe and irreversible brain damage, and was diagnosed "neocortically dead", with no awareness or feelings. Unlike Mary O'Connor, Mr. Delio had no ability to commit a voluntary act nor did he have any perceptual or sensory awareness. In short, he had a total lack of consciousness of his environment.

In *Matter of Eichner v Dillon* (52 NY2d 363), Brother Fox was in an irreversible and permanent vegetative coma, without the ability to feel, see, think, sense, communicate, feel emotions, etc., and without any hope of recovery. In the companion case, *Matter of Storar* (52 NY2d 363), the patient was diagnosed as terminal and dying of cancer.

Mrs. O'Connor's condition does not fit into any of the cases which have been decided in the appellate courts of this State. She is not in a persistent vegetative state; she is not comatose; she is not brain dead. Her condition has not even been diagnosed as terminal. There have been signs of improvement, but full recovery seems unlikely.

The majority also relies upon the case of *Matter of Conroy* (98 NJ 321, 486 A2d 1209); however, that case is also distinguishable. Although Claire Conroy was not brain dead, comatose, or in a chronic vegetative state, her intellectual capacity was very limited, she was unable to respond to verbal stimuli, she was unable to speak, she was unaware of her surroundings, and had no higher functioning or consciousness.

The reliance of the *Delio* court on the cases of *Matter of Conroy (supra)* and *Brophy v New England Sinai Hosp.* (398 Mass 417, 497 NE2d 626) is set forth in the following language: "We agree with those courts' decisions that the with-

drawal or withholding of feeding by artificial means should be evaluated in the same manner as any other medical procedure. In this respect, we view nutrition and hydration by artificial means as being the same as the use of a respirator or other form of life support equipment" *(Matter of Delio v Westchester County Med. Center, supra,* at 19). There is no question that *Delio* now stands for that principle, although it should be pointed out that not only is *Conroy* distinguishable from the instant case, as noted above, but that in *Brophy,* the patient was in a persistent vegetative state, unlike this case.

I do not view the *Delio* decision as standing for the principle that a life support system may be withdrawn from a patient in Mrs. O'Connor's condition even if there is clear and convincing proof of her desires. The issue in the *Delio* case was "whether the common-law right to decline * * * treatment recognized by the courts of this State encompasses a right to remove or withhold artificial means of nourishment and hydration to an individual in a persistent vegetative state with no hope of recovery" *(Matter of Delio v Westchester County Med. Center, supra,* at 2). In my view, the majority opinion today constitutes a significant extension of the law which I am not prepared to support.

It is well settled that the common-law right to refuse medical treatment is not absolute and may, in some cases, yield to a compelling State interest. The four compelling State interests commonly identified with respect to medical treatment decisions are (1) the preservation of life, (2) the prevention of suicide, (3) the protection of innocent third parties, and (4) the maintenance of the ethical integrity of the medical profession *(Matter of Delio v Westchester County Med. Center, supra,* at 22-23).

The preservation of life has a high social value in our culture *(Becker v Schwartz,* 46 NY2d 401, 411), and our society has always been one to acknowledge the sanctity of life *(O'Toole v Greenberg,* 64 NY2d 427). Thus, for instance, "a parent may not deprive a child of lifesaving treatment, where the only alternative is certain death" *(Joswick v Lenox Hill Hosp.,* 134 Misc 2d 295, 297). "For though it has been said that the death of one person affects us all, so too even to a greater degree does the concern that is shown for the maintaining of an individual human life affect not only us as individuals now, but also the very structure of our future society" *(Matter of Long Is. Jewish-Hillside Med. Center v Levitt,* 73 Misc 2d 395, 397).

Under the circumstances in this case, the State's interest in the preservation of life is more compelling than any interest of a patient which may have been expressed in a clear and convincing manner. The State has an interest in preserving the life of Mary O'Connor as an individual and in preserving life in general *(Matter of Conroy, supra)*. "This interest in preserving life derives from our instinct for self-preservation and is essential to our survival as a civilization. That we protect the lives of the weakest and most vulnerable of our society shows us to be a humane and caring society" *(In re Gardner,* 534 A2d 947, 957 [Me] [Clifford, J., dissenting]).

Similarly, the State's interest in preventing suicide has long been recognized and is demonstrated by several statutes. For example, aiding another to commit suicide is a felony (Penal Law § 125.15 [3]), as is promoting a suicide attempt (Penal Law § 120.30), while a person may use physical force to prevent a suicide (Penal Law § 35.10 [4]). A prisoner in a State correctional facility has no right to starve himself to death and may be forcibly fed *(Matter of Von Holden v Chapman,* 87 AD2d 66). Further, the State may confine a person to a mental institution against his will if that person is mentally ill and poses a substantial threat of physical harm to himself or others (Mental Hygiene Law §§ 9.37, 9.39, 9.41). "Such a threat can result from a refusal or inability to meet his essential needs for food, clothing or shelter" *(Matter of Carl C.,* 126 AD2d 640).

While there are no innocent third persons requiring the State's protection herein *(cf., Matter of Winthrop Univ. Hosp. v Hess,* 128 Misc 2d 804 [mother with two young children, one only a month old, required to have blood transfusions during surgery]), the court must be concerned with the maintenance of the ethical integrity of the medical profession. Two commentators, Mark Siegler, M.D. and Alan J. Weisbard, J.D., have written:

"The death with dignity movement has advanced to a new frontier: the termination or withdrawal of fluids and nutritional support.

"As recently as five years ago, or perhaps three, the idea that fluids and nutriment might be withdrawn, with moral and perhaps legal impunity, from dying patients, was a notion that would have been repudiated, if not condemned, by most health professionals. They would have regarded such an idea as morally and psychologically objectionable, legally proble-

matic, and medically wrong. The notion would have gone 'against the stream' of medical standards of care * * *

"This is an unexpected development and one that runs counter to the traditions of medical care. We feel compelled to speak out to prevent the all-too-rapid acceptance of this new emerging standard medical practice, that of withdrawing fluids or nutritional supports from some classes of patients. This development may threaten patients, physicians, the patient-physician relationship, and other vital societal values * * *

"We have deep concerns about accepting the practice of withholding fluids from patients, because it may bear the seeds of unacceptable social consequences. We have witnessed too much history to disregard how easily a society may disvalue the lives of the 'unproductive'. The 'angel of mercy' can become the fanatic, bringing the 'comfort' of death to some who do not clearly want it, then to others who 'would really be better off dead,' and finally, to classes of 'undesirable persons,' which might include the terminally ill, the permanently unconscious, the severely senile, the pleasantly senile, the retarded, the incurably or chronically ill, and perhaps, the aged * * * In the current environment, it may well prove convenient—and all too easy—to move from recognition of an individual's 'right to die' (to us, an unfortunate phrasing in the first instance) to a climate enforcing a 'duty to die.' * * *

"The issue is complicated, the tradition of medicine long, and therefore, a slow and conservative approach would seem advisable" (Siegler & Weisbard, *Against the Emerging Stream: Should Fluids and Nutritional Support Be Discontinued?*, 145 Archives of Internal Medicine 129-131 [1985], quoted in *Matter of Guardianship of Grant,* 109 Wash 2d 545, 571, 572, 747 P2d 445, 459 [Andersen, J., concurring in part, dissenting in part]).

Although some in our society advocate the termination of life, active euthanasia has not yet met with approval by the majority of our citizens, and, certainly, has not been adopted by legislative bodies or courts in our sister States. Moreover, as a compassionate society, we, as a people, and the courts, as guardians of our rights, have rejected various forms of punishment as cruel and inhuman. In the absence of a medical consensus that a patient in Mrs. O'Connor's condition would not suffer severe pain and thirst in the process of dying without hydration and nutrition, it is my view that it is cruel and inhuman to sentence her to a death which will be accompanied by such extreme discomfort.

We reject the termination of life; yet it appears that we are willing to stand by and allow a patient who is awake, alert and cognizant to die a painful death. The State's interest in preserving life and its interest in preventing cruel and inhuman punishment, mandates that we make a distinction between those people who are in a condition which could be described as comatose, vegetative, brain dead, neocortically dead, etc., from individuals like Mrs. O'Connor, whose condition is not as severe and is not even diagnosed as terminal.

"[T]he State's interest * * * weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims" (Matter of Quinlan, 70 NJ 10, 41, 355 A2d 647, 664). Where a patient is in a chronic vegetative state, as in Eichner, the right to privacy clearly outweighs the State's interest to preserve life, since such a patient "has no hope of recovery and merely lies * * * in a technological limbo, awaiting the inevitable" (Matter of Eichner [Fox], 73 AD2d 431, 465, mod 52 NY2d 363, supra).

Neither the intravenous nor the nasogastric tube which is inserted in the throat is a highly invasive procedure, nor is Mrs. O'Connor's condition such as to require this court to override the State's interest in preserving human life. Where a nonterminally ill patient is being provided with nutrition in a relatively noninvasive and pain-free manner, the withdrawal of a feeding tube for the purpose of hastening his or her death ignores the legitimate and well-established interest of the State in preserving life and preventing suicide, exposes many members of our society to potential abuse, and should not be sanctioned. "Our status as a civilized society is significantly discredited when we abdicate our responsibility to care for those who are unable to care for themselves. The provision of sustenance to the most vulnerable among us serves as a binding value in our society and is an obligation we cannot ignore. This Court's decision, premised on the unarticulated notion that [Mary O'Connor's] life is not worth maintaining, creates a troubling precedent. Those in our society least able to care for themselves, the disabled, the retarded, the elderly, will not fare well under a quality of life assessment, implicitly used here" (Matter of Gardner, supra, at 958 [Clifford, J., dissenting]).

Mary O'Connor will inexorably die as a result of the withdrawal of the intravenous feeding tube. Dr. Sivak testified that Mrs. O'Connor would experience pain, intense thirst and hunger, and be extremely uncomfortable in the event the

intravenous feeding was stopped and a feeding tube not used. This was essentially corroborated, albeit by implication, by Dr. Wasserman's testimony that if she did experience pain, the pain could be alleviated by the use of pain-killers. She will starve to death within about a week and this court tacitly approves her death. Label it what you will, it is clear that the court's decision today is but another step towards establishing euthanasia as a legitimate public policy. This is quite a reversal from this court's statement a mere eight years ago in *Matter of Eichner:* "Euthanasia, referred to colloquially as 'mercy killing', is consequently proscribed by the criminal law * * * No one dare question the existence of a strong public policy that values and protects the sanctity of life" *(Matter of Eichner [Fox],* 73 AD2d 431, 450, *supra).*

Accordingly, the judgment appealed from should be reversed, on the law and the facts, the petition granted, and the cross application denied.

RUBIN and WEINSTEIN, JJ., concur with MANGANO, J. P.; BROWN, J., dissents and votes to reverse the judgment, on the facts, and to grant the petition and deny the cross application, with an opinion; BALLETTA, J., dissents and votes to reverse the judgment, on the law and the facts, and to grant the petition and deny the cross application, in a separate opinion.

Ordered that the judgment is affirmed, without costs or disbursements; and it is further,

Ordered that enforcement of the judgment is stayed for five days from the date of this order so as to permit an application for leave to appeal, if the appellant be so advised.