**In re Petition of the DEPARTMENT OF VETERAN'S AFFAIRS MEDICAL CENTER.**

**No. M–45.**

United States District Court, S.D. New York.

Aug. 16, 1990.

Supplemental Order Aug. 17, 1990.

Rose Warren, pro se.

Elaine Wood, Asst. U.S. Atty., for defendant.

**496**

## ORDER

CONBOY, District Judge:

Upon the petition of the Department of Veteran's Affairs Medical Center, a medical facility owned and operated by the Department of Veteran's Affairs, located in the Bronx, New York, and upon all of the testimony received at an emergency hearing before the Court on August 16, 1990, and based upon our findings dictated into the stenographic record at the conclusion of the hearing, upon which we will elaborate in a written opinion to be issued tomorrow,

it is hereby ORDERED that Dr. Julius Wolf is appointed guardian for Bob Warren for the limited purpose of consenting to the administration of such surgical treatment and any related medical treatment as in the opinion of the physicians in attendance is necessary for his well-being and to preserve his life;

and it is further ORDERED that any informed consent that Dr. Julius Wolf exercises on Bob Warren's behalf be conditioned upon Bob Warren's continued incompetence to render informed consent on his own behalf;

and it is further ORDERED that the petitioner, the Department of Veteran's Affairs Medical Center, acting through its duly accredited and licensed physicians in attendance, is authorized, as long as Bob Warren remains a patient at the Department of Medical Affairs Medical Center, to continue to administer surgical and any related medical treatment to Bob Warren necessary for his well-being and to preserve his life.

SO ORDERED.

## SUPPLEMENTAL ORDER

This is a sad and difficult case. A man lies in the intensive care unit of a local hospital, delirious and semi-conscious, unable to communicate, and unaware that he has already suffered major organ damage. He does not know that if surgery to remove a part of his right limb is not performed immediately, he will die. His wife of many years, there being no children and no other relatives, has refused to consent to the surgery on his behalf. She asserts, in the face of the grim diagnosis of the doctors, that he does not have a life-threatening gangrenous condition, and that the doctors have ulterior and base motives for the surgery. She insists, most emphatically, that from time to time, and specifically three years ago, her husband expressed the wish that no amputation be allowed, even in the face of certain death. The Government seeks an order in effect authorizing the surgery.

We have been required, by circumstances, to proceed on an emergency basis, to find the appropriate course in a matter that is literally a case of life or death.

We have declined to hear the Government ex parte, and insisted on hearing the patient's wife. We have tried, unsuccessfully, to obtain counsel for her. We have conducted a telephone deposition of the patient's private physician. We have closely examined the hospital's doctors. We have reviewed the case authority as best we can, in light of the urgent press of time. We have concluded that we must issue the order sought by the Government. Mindful of the testimony of the doctors that every hour lost lessens the patient's chances for successful surgery, but also being keenly aware of the important rights of the patient and his wife that are implicated here, we have stayed our Order, issued last evening, until noon today to afford the patient's wife an opportunity to present her case to the Court of Appeals. This opinion is issued in furtherance of our Order of last evening.

## FINDINGS OF FACT

1. Bob Warren is a seventy-eight year old patient in the care of the professional staff of a federal medical facility located in this district, the Department of Veteran's Affairs Medical Center ("V.A. Hospital") in the Bronx, New York.

2. Mr. Warren is a long-term diabetic who has received medication for many years to control the disease. Specifically, he has received medicine on a routine basis

from a clinic associated with the V.A. Hospital.

3. Dr. Lee Mazzella, a private physician with offices in the Bronx, from time to time also treated Mr. Warren for his condition and prescribed medicine for Mr. Warren.

4. After collapsing, on August 10, 1990, in a public street in front of Dr. Mazzella's office, and in the company of his wife, Rose Warren, Mr. Warren was taken, over the objection of his wife, by ambulance to the V.A. Hospital. This was done with the concurrence of Dr. Mazzella.

5. On admission, the medical staff determined that the patient had been suffering from "dry" gangrene in his right foot for more than one month. "Dry" gangrene is characterized by dead, non-viable tissue, and can be a pre-condition to "wet" gangrene, in which the tissue is infected.

6. In the ensuing days, hospital staff administered certain quantities of Librium and other drugs to Mr. Warren, on the assumption that the patient was an alcoholic (an assumption now discounted), to prevent him from suffering alcohol withdrawal symptoms.

7. On August 13, 1990, a neurologist was consulted because the patient appeared confused and incoherent. Mrs. Warren confirmed the patient's confused state. On the basis of the neurologist's judgment, the Librium was discontinued.

8. On August 14, 1990, Dr. Hideki Sakurai, a neurosurgeon at the V.A. Hospital, reviewed the patient's medical file and determined that the patient was "alert." Mrs. Warren also found her husband to be alert on this date.

9. At approximately noon on the next day, August 15, 1990, the medical staff determined that Mr. Warren had developed "wet" gangrene in two of the toes on his right foot. Wet gangrene is a dangerous condition which has severely adverse effects on the cardiovascular and nervous systems, and makes diabetes medically uncontrollable. The staff also observed that his mental condition had changed markedly: Mr. Warren was semi-conscious and unable to communicate.

10. Late on Wednesday, August 15, 1990, attending physicians advised Mrs. Warren that surgery to remove the source of the infection, that is, amputation of the right foot, was necessary to improve her husband's condition. On her husband's behalf, Mrs. Warren refused to consent to the surgery, and signed a form to that effect.

11. Shortly thereafter, in anticipation of the need to intubate the patient, that is, insert artificial breathing apparatus into him, Mr. Warren was given a sedative to facilitate the procedure.

12. At approximately 2:00 a.m. on August 16, 1990, Mr. Warren's condition became grave, and he was admitted to the intensive care unit ("ICU"), where he was put on a ventilator and received extensive medical intervention techniques, including insertion of a pulmonary artery catheter, insertion of a radial arterial IV in his hand, and administration of a stomach decompression procedure. Broad-spectrum antibiotics were administered.

13. At approximately 3:00 a.m., at the direction of Dr. Neil Halpern, who was supervising the patient's care at that time, a member of the hospital staff telephoned Mrs. Warren to notify her of the further deterioration of her husband's condition and to attempt once again to obtain her consent, on behalf of her husband, to surgical amputation of the right foot. When such consent was not forthcoming, a hospital member was dispatched to her home to take her back to the hospital for "face-to-face" discussions with the doctors.

14. Mrs. Warren was told, in the most graphic terms, that her husband's life lay in the balance, and that, without the surgery, her husband would certainly die in the near future. Nevertheless, she continued to withhold consent.

15. Hospital authorities then asked the United States Attorney to apply for a court order appointing a hospital administrator as a guardian for Mr. Warren, who would provide consent to the surgery.

16. At 8:15 a.m., Dr. Halpern examined Mr. Warren and found him to be in a stuporous-type condition, with unfocussed

eyes searching the ceiling, and incapable of communicating in any way.

17. At 3:00 p.m., Dr. Halpern again visited the patient, and found that, although the patient was awake, he was delirious and semi-conscious. Dr. Halpern found that no meaningful contact could be made with the patient, because the patient could not respond in any fashion, through speech, in writing, or otherwise.

18. Dr. Halpern concluded that a patient with metabolic derangements of the kind the patient was experiencing was not competent to consent to or withhold consent from surgery to amputate the right foot.

19. No communication has been had with the patient, at any time during his hospitalization, about his immediate need for surgery and the consequences of not having surgery.

20. To date, two of Mr. Warren's vital organs have already failed. Further organ damage is inevitable without the surgery.

21. There is a mortality rate of 100% for patients in this condition if surgery is not performed.

22. Although surgery will not guarantee the patient's survival, the medical staff has concluded that, with surgery, he will have a "fighting chance" to pull through.

23. Each hour of delay in performing the surgery decreases the patient's chances for survival.

24. Mrs. Warren is a registered nurse who worked at Harlem Hospital for thirty years, and has been caring for her husband at home.

25. Mrs. Warren is of the firm conviction that her husband does not have "wet" gangrene.

26. Mrs. Warren is also of the firm conviction that the doctor's motives for urging surgery stem from the fact that the interns have little to occupy their time and have a morbid desire to "cut."

27. Mrs. Warren maintains that her husband, based on conversations she had with him in the past few years, would not consent to the surgery because he would rather die than live without his foot. She makes specific reference to conversations they had within the last three years regarding Mr. Warren's sister, who died of diabetes-related complications after having refused surgery.

## DISCUSSION

In 1914, Judge Cardozo stated the broad principle that, with respect to *competent* adults, "every human being of adult years and sound mind has a right, a common law right, to determine what shall be done with his own body and cannot be subjected to medical treatment without his consent." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129–30, 105 N.E. 92, 93–94 (1914). More recently, the New York Court of Appeals restated this principle:

> In this state ... there is no statute which prohibits a patient from declining necessary medical treatment or a doctor from honoring a patient's decision. To the extent that existing statutory and decisional law manifests the state's interest on the subject, they consistently support the right of the *competent* adult to make his own decision by imposing civil liability on those who perform medical treatment without consent, although the treatment may be beneficial or even necessary to preserve the patient's life.

*In re Storar*, 52 N.Y.2d 363, 377, 438 N.Y. S.2d 266, 273, 420 N.E.2d 64, 71 (1981) (emphasis added). In *Storar*, the Court of Appeals upheld a patient's right to decline extraordinary medical treatment on the ground that the record established by clear and convincing evidence that the patient, before becoming incompetent, had expressed his desire not to be placed on life-sustaining equipment.

In the *Matter of Westchester County Medical Center*, 72 N.Y.2d 517, 534 N.Y. S.2d 886, 531 N.E.2d 607 (1988), the court applied the *Storar* clear and convincing standard and concluded that evidence was insufficient to establish that an incompetent patient had, while competent, expressed a firm and settled commitment to termination of life support systems under

the circumstances presented. Thus, the hospital was authorized to administer nasogastric feeding to preserve the patient's life.

In *Application of Collins*, 44 Misc.2d 622, 254 N.Y.S.2d 666 (Nassau Co.Sup.Ct. 1964), the court granted an application to allow a surgical operation on a comatose patient who could not give consent, where the patient's wife refused to give consent, and evidence established that if the operation were not permitted, the patient would die. The court found that the patient's wife had given reasons for refusing consent which, although she felt they were justified, were medically unsound. This case has been cited by a subsequent Nassau County Supreme Court, *Application of Long Island Jewish Hillside Medical Center*, 73 Misc.2d 395, 342 N.Y.S.2d 356 (Nassau Co.Sup.Ct.1976). There, the court appointed a guardian who authorized surgery involving the immediate amputation of the patient's leg above the knee, as it was necessary to save his life. *Id.* The patient was suffering from a disease which rendered him incapable of rendering judgments relative to his health. The court concluded that an emergency condition may justify implication of consent if a patient gives actual consent to some treatment, and during the course of the treatment, an unanticipated emergency condition arises which threatens the patient's life.

In the leading case of *Application of the President and Directors of Georgetown College*, 331 F.2d 1000 (D.C.Cir.1964), Circuit Judge J. Skelly Wright, reversing a district court decision, ordered immediate blood transfusions for a pregnant woman who was "not in a mental condition to make a decision." In an emergency similar to that which we confront here, Judge Wright eloquently stated:

> The final, and compelling, reason for granting the emergency writ was that a life hung in the balance. There was no time for research and reflection. Death could have mooted the cause in a matter of minutes, if action were not taken to preserve the *status quo*. To refuse to act, only to find later that the law required action, was a risk I was unwilling

to accept. I determined to act on the side of life.

*Id.* at 1009–10.

We are confronted here with a patient who is not in a vegetative state, and whose prognosis is positive if the surgery is allowed to proceed. Furthermore, this patient, while fully competent, entered the V.A. Hospital in the course of seeking help for managing a disease which he had controlled and was fully confident could be controlled. We observe that there is here no issue of the patient's religious values.

Both the physicians and the patient's wife are in agreement that Mr. Warren is not at the present time competent to decide the matter for himself. The only evidence before the Court that he ever expressed a view that he would rather die than undergo the surgery is the assertion by his wife that, from time to time, he stated to her his wish that, even in the face of imminent death, no amputation of limb should be allowed. Since the only source of this evidence comes from Mrs. Warren, we are mindful of our obligation to consider the circumstances carefully in which her recollection has been put forward. We emphasize that we make this assessment with an abiding respect for Mrs. Warren as a wife wholly devoted to her husband.

We nonetheless observe, and have so found, that her intractable conviction that her husband is not suffering from a dangerous gangrenous condition, made and held in the face of categorical medical testimony to the contrary, causes us to question the strength and reliability of the recollection she reports. Furthermore, we find troubling the intense hostility that Mrs. Warren has expressed toward the medical staff at the hospital. We conclude that these strongly held convictions impede her objectivity in reporting the true state of her husband's intention under circumstances such as those that confront us here.

Accordingly, with the sure knowledge that Mr. Warren will die without our ordering the surgery, and being profoundly troubled by Mrs. Warren's inability both to

comprehend the gravity of the situation and to report objectively his wishes under these desperate circumstances, and being therefore left with no clear and convincing evidence of his intention to refuse the surgery, we opted in favor of life.

SO ORDERED.